**HUDSON TRANSIT LINES, INC., Plaintiff,**

v.

**Chaim FREUND, Avadga Einhorn, Jacob Einhorn, Congregation Adath Yereim, Congregation Arugath Hobosem, Congregation Ahavas Israel, Congregation Beth Yeshaje, Congregation Beth Jonah, Congregation Camp Rav Tov, Congregation Kehilath Yaacov of Papa, Congregation Yetev Lev D'Satmar, Kiddland Corp., and United Jewish Organization of Williamsburgh, Inc., Defendants.**

**No. 76 C 1836.**

United States District Court, E. D. New York.

March 17, 1981.

Friedman & Gass, New York City, for plaintiff by Peter F. Gass, New York City.

Mazur & Bocketti, New York City, for defendants by Phillip Bocketti.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Originally this action was brought pursuant to "self-help" provisions of § 222(b) of the Interstate Commerce Act, Part II, 49 U.S.C. § 322(b)(2) (1976) (repealed 1978) ("the Act"),[1] to enjoin defendants from engaging in interstate bus transportation for hire in violation of the Act to plaintiff's injury. Plaintiff Hudson Transit Lines, Inc. ("Hudson") is a common carrier authorized by the Interstate Commerce Commission ("ICC") to transport passengers interstate by motor vehicle between New York City and, *inter alia*, various locations in the resort area of the Catskill Mountains in New York State. Hudson's affiliate, Hudson Transit Corp., also operates under the same trade name "Shortline", and is authorized by the New York State Department of Transportation to transport passengers intrastate between the same locations. The interstate route between the City and the mountains runs via the Lincoln Tunnel and the New Jersey Turnpike. The action is now before the Court on Hudson's petition for an order holding certain defendants in contempt of a consent judgment entered in August 1977.

Named as defendants in the original complaint were Chaim (Herman) Freund, Avadga (Victor) Einhorn, Avadga's father, the Rabbi Jacob Einhorn, and his Congregation Beth Jonah, four other Hassidic congregations in Brooklyn, New York, the United Jewish Organizations of Williamsburgh, Inc. ("UJO Inc."), an umbrella organization of Hassidic and other Jewish yeshivas, congregations and organizations, and the corporation which allegedly provided some of the buses the other defendants used. On August 19, 1977, the court approved a consent judgment entered into by the parties which provided

"that defendant United Jewish Organizations of Williamsburgh Inc., its agents, attorneys, servants, employees and members, and all others to whom notice hereof may come, be [and] they hereby are jointly and severally restrained and enjoined in any manner, device or form, directly or indirectly from operating, or aiding, assisting or abetting others in the operation in interstate commerce subject to Part II of the Interstate Commerce Act of any transportation service by motor vehicle which involves any pick-up or discharge of passengers within the City of New York other than the county of Kings unless there shall come into effect to this defendant a certificate of or permit issued by the Interstate Commerce Commission authorizing the transportation restrained herein, and it is further,

"Stipulated and agreed that defendants Chaim Freund, Avadga (Victor) Einhorn, Jacob Einhorn and Congregation Beth Jonah, and each of them, their agents, attorneys, servants, employees and members, and all others to whom notice hereof may come be and they hereby are jointly and severally restrained and enjoined in any manner, device or form, directly or indirectly, from operating, or aiding, assisting or abetting others in the operation in interstate commerce subject to Part II

---

1. The portion of the statute applicable at the time of the entry of the injunction provided:

"(2) If any person operates in clear and patent violation of any provisions of section 303(c), 306, 309, or 311 of this title, or any rule, regulation, requirement, or order thereunder, any person injured thereby may apply to the district court of the United States for any district where such person so violating operates, for the enforcement of such section, or of such rule, regulation, requirement, or order. The court shall have jurisdiction to enforce obedience thereto by a writ of injunction or by other process, mandatory or otherwise, restraining such person, his or its officers, agents, employees, and representatives from further violation of such section or of such rule, regulation, requirement, or order; and enjoining upon it or them obedience thereto. A copy of any application for relief filed pursuant to this paragraph shall be served upon the Commission and a certificate of such service shall appear in such application. The Commission may appear as of right in any such action. The party who or which prevails in any such action may, in the discretion of the court, recover reasonable attorney's fees to be fixed by the court, in addition to any costs allowable under the Federal Rules of Civil Procedure ...."

This provision was repealed by P.L. 95–473, § 4(b), 92 Stat. 1466 (1978).

of the Interstate Commerce Act of any transportation service by motor vehicle, unless and until there shall come into effect with respect to these defendants a certificate of or permit issued by the Interstate Commerce Commission authorizing the transportation restrained herein."

Despite the entry of this decree the conduct enjoined persisted, and on September 12, 1977, Hudson obtained an order from this Court directing Freund, the Einhorns, Congregation Beth Jonah and UJO Inc. to show cause why they should not be held in contempt of the August 12 decree. This petition for contempt was withdrawn on consent of the parties on February 14, 1978, without prejudice to renewal.

During the next season a second order issued on July 11, 1978 directing these same defendants to show cause on July 20, 1978 why they should not be held in contempt of the August 12 decree. The petition also named the Brookfield Bus Company and its president, Bud Blasi, as defendants' agents and co-conspirators in violating the terms of the decree. Following hearings on July 20 and 25, 1978, the application was withdrawn as to Brookfield but the other named defendants were found by default to be in civil contempt of the decree. A fine was ordered imposed upon those contemnors in the amount of Hudson's lost revenues during the time of the alleged contempt. The defaulting contemnors thereupon moved to vacate the default, submitting affidavits and testifying that they had nothing to do with the interstate transportation for hire of anyone from New York City to the mountain resorts.

Following discovery, hearings were held on January 20, 22 and 24, 1979, concerning the activities which allegedly were conducted in violation of the August 1977 decree. Final briefs were submitted on November 7, 1979. The Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R. Civ.P., follow.

The issue presented is whether any party bound by the August 12, 1977 decree and named in the July 1978 show cause order, "in any manner, device or form, directly or indirectly ... operat[ed], or aid[ed], assist[ed], or abett[ed] others in the operation" of any motor transportation service for hire in violation of the terms of the decree applicable to such party.

■■■ A party seeking to hold an adversary in civil contempt of a consent decree must establish by clear and convincing proof that the putative contemnor has violated the decree. See *Erhardt v. Prudential Group, Inc.,* 629 F.2d 834 (2d Cir. 1980); *Hart, Schaffner & Marx v. Alexander's Department Store, Inc.,* 341 F.2d 101 (2d Cir. 1965); *Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1297 n.12 (E.D.N.Y.1979). "A mere preponderance of the evidence will not suffice," *Hart, Schaffner & Marx, supra,* 341 F.2d at 102. A finding of wilfulness on the part of the alleged contemnor is unnecessary, see *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *N. L. R. B. v. Local 282, International Brotherhood of Teamsters,* 428 F.2d 994, 1001 (2d Cir. 1970), but such a finding will entitle the complaining party to include its attorney's fees in the reasonable costs of prosecuting the contempt. See *Vuitton et Fils, S. A. v. Carousel Handbags,* 592 F.2d 126, 130–31 (2d Cir. 1979); *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 664–65 & n.5 (2d Cir. 1970); *Andre Matenciot, Inc. v. David & Dash, Inc.,* 422 F.Supp. 1199, 1210–11 (S.D.N.Y.1976).

Under these principles plaintiff has adequately proved that Avadga (Victor) Einhorn and Chaim (Herman) Freund, but not Rabbi Jacob Einhorn, Congregation Beth Jonah or UJO, Inc., wilfully violated the August 1977 decree, are in civil contempt thereof and are liable for a fine of $60,854 plus plaintiff's expenses, including attorney's fees in prosecuting the contempt.

■■ That Victor Einhorn wilfully violated the consent decree was clearly and convincingly proved. The evidence adduced established that between the last weekend in June and Labor Day 1978 buses were provided to carry passengers from the Hassidic Jewish community for hire on a regular,

scheduled basis between the Catskills and New York City; that these buses traveled interstate; and that Einhorn participated in numerous aspects of this bus service.

The evidence showed that buses owned by the Brookfield Bus Service were being used for this purpose. Passengers were seen and photographed paying fares and boarding buses chartered from Brookfield at Lee Avenue in Brooklyn, New York (Exhs. 45a, 45b, 45c; Russo Tr. 261–62).[2] Brookfield buses were sighted almost daily until the end of July traveling interstate on the New Jersey Turnpike (Kavanaugh Tr. 11–12, 46). Two other buses, with which Einhorn was proved to be closely involved (see *infra*), were also regularly seen on Fridays and Mondays throughout the season (Kavanaugh Tr. 12–13). Advertisements (*e. g.*, Exh. 30), and posters (Exh. 29) informed potential passengers from the Jewish community in Williamsburgh and in the mountains of the scheduled departure and arrival times of the "only Jewish" buses and listed telephone numbers, including Einhorn's, for more. information.

There is no serious question that plaintiff faced direct competition on its interstate run from these activities. At times the competition was blatant. For example, on the second day of plaintiff's season on the run from the mountains to the city, two Brookfield buses, which started after plaintiff's bus, picked up all the fares waiting on the roadside. Evidently Einhorn in an advance car had warned the passengers not to take plaintiff's bus (Kavanaugh Tr. 9–10, 11, 20). Furthermore, Einhorn was seen supervising Brookfield drivers in Williamsburgh and on Forty-Seventh Street in Manhattan (Kavanaugh Tr. 17–18, 51–52, 54–55). There was testimony that Einhorn had ordered Gidalowitz, a Brookfield driver, to cut off plaintiff's driver Kavanaugh (Kavanaugh Tr. 24), and that Gidalowitz' failure to do so led to his dismissal from Brookfield.

In his deposition, parts of which were read into the record, Victor Einhorn stubbornly denied every link between him and the service provided through Brookfield. Even so, he grudgingly acknowledged having several talks with the people at Brookfield, including the president, the mechanics and the bus drivers. He admitted knowing Wurtzburger, the fare collector, and the driver Gidalowitz, and others testified to seeing Einhorn with them often.

The circumstances and details about the competing bus service that plaintiff's witnesses provided at the hearing have convinced the Court that notwithstanding Einhorn's denials under oath by affidavit and at the hearing on the motion to vacate the default judgment of contempt, he knowingly participated in providing a bus service for hire for the Jewish community in the summer of 1978 through the Brookfield Bus Service in violation of the August 1977 decree.

Einhorn's contemptuous activities were not limited to helping out with the Brookfield buses. As noted above, other buses traveled interstate between the city and the mountains on Fridays and Mondays during the time Brookfield was involved, and daily after Brookfield withdrew. The testimony and evidence established that these buses, and others that continued to ply the interstate route after Brookfield ended its participation, were operated under Einhorn's direction and were available because of his efforts. Following the first application for contempt after the entry of the August 1977 decree, there was an apparent change in ownership of the buses used to compete with plaintiff during 1977. Handwriting expert Peter Tytell convincingly demonstrated, however, that it was Einhorn—whose genuine signature appeared on court documents—who signed various 1977 registration forms for transferring title to the buses from Congregation Beth Jonah. He also signed the 1978 registration forms and applications for tax exemption for the transferred buses on behalf of the transferee congregations, assuming the role of

---

**2.** Because the numbering of the transcripts of the hearings was not consecutive but was started over each day, references to the transcript pages are to the name of the witness followed by the transcript page ("Tr.").

those congregations' "Secretary" under the names "Max Gross," "Abraham Gutterman," "Max Gutterman" and "Itchak Shtein" (Tytell Tr. 227–41; Exhs. 1–23, 41, 42, 43).

At the hearing, Rabbi Israel Rubin claimed responsibility as the "prime mover" of the 1978 bus service to the mountains. There was enough evidence, however, about the close contacts between Einhorn and Rubin—for example, Rubin's use of Einhorn's apartment and telephone as an information center for the service, and the coincidence that Rubin's search for buses among the congregations turned up just those that Einhorn still controlled—to find that even if Rubin did all he claimed, his testimony still did not exclude Einhorn's participation.[3] Certainly Rubin's purportedly primary role could not shield Einhorn from his duty to comply with the terms of the consent decree which could be violated, as Einhorn knew, if all Einhorn did was "aid" or assist others in the operation of the transportation activity that was enjoined. Furthermore, however the primary responsibility was apportioned between Einhorn and Rubin, it was clear from the testimony that Einhorn actively supervised the buses' daily operations. He was seen directing drivers and coordinating the transfer of passengers (Rosenblatt Tr. 210–17). He undertook to have the buses repaired (Palluzzi Tr. 179–80; Tedesco Tr. 186–97; Exh. 37). On at least one occasion he even drove one of the buses himself (Exh. 38; Morgan Tr. 198–202).

The record of Chaim Freund's activities allegedly in violation of the decree is more sparse. Freund's primary role appears to have been that of taking the non-Brookfield buses to be repaired (see Exhs. 34, 35, 36, 37; Tedesco Tr. 177–79; Palluzzi Tr. 188, 194). Also, his signature as "Secretary" of Congregation Beth Jonah authorized the transfer of one of the buses (1978 registration # 5182 BA) to Congregation Minchas

David, on whose behalf Einhorn, as its "Secretary," "Max Gross," applied for a tax exemption certificate and for a 1978 registration (Exhs. 1, 4). In this connection it should be noted that the initials "C.M.D.," which the Court understood to signify "Congregation Minchas David," were subscribed on the poster announcing the schedule that was followed by the competitive buses (Exh. 29; Kavanaugh Tr. 12–13). Furthermore, although there was no direct evidence that Freund was involved like Einhorn in procuring the Brookfield buses, that poster and the advertisements after Brookfield's withdrawal (Exh. 33) provided convincing proof that throughout the summer it was but a single bus service that the alleged contemnors were operating.

Accordingly, it is the Court's view that Freund's conduct violated the decree. In view of his previous and continuing relationship with Einhorn and his signing of the consent decree, his conduct must be considered, like Einhorn's, to have been wilful and a "volitional act by one who knows or should reasonably be aware that his conduct was wrongful." *United States v. Greyhound Corp.*, 508 F.2d 529, 531–33 (7th Cir. 1974).

■ The only link evident in the record which plaintiff contends is proof that UJO Inc. violated the decree in 1978 is that the Organization's lapsed temporary ICC motor carrier # 140991 remained on buses which picked up and discharged passengers on Forty-Seventh Street in New York City. This hardly amounts to the active encouragement and sponsorship which plaintiff originally sought to enjoin (see Complaint ¶¶ 20, 21), and certainly does not indicate that UJO Inc. did anything in violation of the decree in connection with these buses, since the evidence clearly demonstrated that the buses were controlled by Einhorn and others and were not owned or controlled by UJO Inc.

---

**3.** There was other evidence linking Einhorn to the bus service through his apartment at 164 Hewes Street in Brooklyn. This address was listed on repair bills for the buses used in the illegal service as that of the former owner Congregation Beth Jonah (Exh. 34) and the owner to whom most of the bills from the 1978 season were directed, Congregation Yatev Lev (see Exhs. 35, 36, 37).

As to the alleged contemnors Rabbi Jacob Einhorn and Congregation Beth Jonah, there was no convincing evidence which connected them to any activities in violation of the decree.

In view of the foregoing, the Court finds that Avadga (Victor) Einhorn and Chaim (Herman) Freund, but not Rabbi Einhorn, UJO Inc., or Congregation Beth Jonah, are in civil contempt of court for their wilful violation of the August 12, 1977 decree.

■ Turning now to the issue of what fine should be imposed for these contemnors' unlawful conduct, the Court will be guided by the principle that sanctions imposed after a finding of civil contempt to remedy past noncompliance with a decree are "not to vindicate the court's authority but to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Vuitton et Fils, S.A. v. Carousel Handbags, supra,* 592 F.2d at 130. Not only may Hudson recover the damages it sustained as a result of each contemnor's unlawful conduct, much like a tort judgment, *see Vuitton et Fils, supra,* 592 F.2d at 130 (approving the analogy in *Parker v. United States,* 153 F.2d 66, 70 (1st Cir. 1946)), between compensatory fine and a tort judgment); *National Research Bureau, Inc. v. Kucker,* 481 F.Supp. 612, 615 (S.D.N.Y. 1979), but it may recover the reasonable costs of prosecuting this contempt proceeding as well, including plaintiff's attorney's fees since the violations were wilful.

By way of a compensatory fine, Hudson sought to recover $60,854 as the net revenues it lost during the 1978 season on the run between the city and the mountains. Plaintiff calculated this amount on the basis of its 191 scheduled trips for two buses carrying forty passengers at a fare of $8.50 per one-way trip, or $64,940. From this figure $4,086 was deducted as revenues earned by plaintiff's intrastate counterpart, Hudson Transit Corp., leaving net lost revenues of $60,854. Plaintiff presented no figures regarding its expenses in bringing the contempt proceedings but reserved the right to present evidence of such expenses in affidavit form.

■ Defendants have disputed the award of such a compensatory fine, contending primarily that the amount of revenue plaintiff seeks to recover is too speculative since plaintiff in their view lacks a "prior basis of doing business" between Williamsburgh and the mountains "against which to measure the expected revenues." Defendant's Post-Trial Memorandum at 4. This contention is without merit. Plaintiff was an experienced bus line. It had assessed the extent of defendants' illegal activities in 1977 before committing drivers and equipment to the 1978 operations (Jamieson Tr. 86). Moreover, defendants' further illegal activities in 1978 provide a telling measure of the accuracy of the extent of plaintiff's commitment and of its calculation of lost revenues. Normally defendants ran two 49-passenger buses at nearly full capacity. Plaintiff's estimate of 40 passengers per run thus provided a permissible basis for computing lost revenues. *Cf. Long Island Rail Road Co. v. Brotherhood of Railroad Trainmen,* 298 F.Supp. 1347, 1350 (E.D.N.Y.1969) (monthly revenue estimate allocated on daily basis).

■ Defendants also contend that the calculation of a compensatory fine is complicated because plaintiff's affiliate, Hudson Transit, conducted operations during the last half of August 1978, which seemingly replaced plaintiff's more expensive service with progressively cheaper intrastate fares of $4.00, $2.00 and finally $1.00. The Court agrees with plaintiff that these operations of a related company were properly treated only in mitigation of the damages that plaintiff would otherwise have incurred. Moreover, the cutting of prices in response to defendants' illegal competition does not derogate from plaintiff's choice of $8.50 as the fare for the interstate route. It was evident that the price cutting would not have occurred but for the recurrence of an illegal bus service which deprived plaintiff of its legitimate, expected interstate clientele.

Accordingly, the court concludes that plaintiff has sustained its burden of proving

the amount of its lost revenues. Plaintiff may recover such amount plus the amount of its expenses, including attorney's fees, in prosecuting this contempt, which it shall provide to the Court by affidavit. Plaintiff shall also submit a proposed form of judgment to be entered against Avadga (Victor) Einhorn and Chaim (Herman) Freund in the amount of plaintiff's lost revenues plus the expenses incurred.

So ordered.