**UNITED STATES of America and Janet Reno, Attorney General of the United States of America, Plaintiffs,**

v.

**Regina Rene DINWIDDIE, Defendant.**

**No. 95–0010–CV–W–8.**

United States District Court,
W.D. Missouri,
Western Division.

April 12, 1995.

finds the evidence irrelevant.

Stephen L. Hill, Jr., U.S. Atty., Alleen S. Castellani, Asst. U.S. Atty., Kansas City, MO, for plaintiffs.

Joseph A. Morrey, St. Joseph, MO, Michael R. Hirsh, Howardstown, KY, for defendant.

## CIVIL CONTEMPT ORDER

STEVENS, Chief Judge.

As ruled from the bench on March 27, 1995, the Court grants plaintiffs' motion filed on March 23, 1995 to find defendant in violation of this Court's permanent injunction filed on March 21, 1995 and therefore in contempt of this Court.

### I. Procedural History

On January 6, 1995, plaintiffs filed: (1) a complaint to enjoin defendant from violating the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), Pub.L. No. 103–259, 108 Stat. 694 (to be codified at 18 U.S.C.

§ 248); and (2) an application for temporary restraining order and further injunctive relief. After issuing a temporary restraining order and a preliminary injunction, the Court issued the permanent injunction. On March 23, 1995, plaintiffs filed a motion for an order that defendant show cause why she should not be held in contempt of the permanent injunction. The Court granted the motion and filed an order that directed defendant: (1) to show cause why she should not be held in contempt; and (2) to appear before this Court on March 27, 1995. On March 27, 1995, the Court conducted a hearing ("civil contempt hearing") at which the parties presented evidence on defendant's activity at Planned Parenthood of Greater Kansas City, 1001 East 47th Street, Kansas City, Missouri, 64110 ("Planned Parenthood") since the issuance of the permanent injunction. The civil contempt hearing [1] was attended by U.S. Attorney Stephen Hill, Jr., Deputy U.S. Attorney Alleen Castellani, defendant Regina Dinwiddie, and defense counsel Joseph Morrey.

## II. Evidence

Plaintiffs presented seven witnesses: (1) Pamela Lyon, a volunteer escort for clients of Planned Parenthood; (2) Tamara Morris, Director of Marketing at Planned Parenthood; (3) Clifford O'Rear, an Orion security guard hired by Planned Parenthood; (4) John Rich, Operations Director at Planned Parenthood; (5) Mary Davis, an administrative assistant at Planned Parenthood; (6) Erika Fox, Director of Public Affairs at Planned Parenthood; and (7) Ellen Brown, Public Affairs Coordinator at Planned Parenthood. Plaintiffs offered four exhibits: (1) a hand-drawn sketch intended for demonstrative purposes only that depicted the general outlines of the physical plant of Planned Parenthood and the surrounding vicinity; (2) a photograph taken by Rich on March 23, 1995 showing defendant standing outside a minivan owned by Fox; (3) a photograph taken by Rich on March 23, 1995 showing four persons: defendant, who was wearing a shirt with the words "Friends of Paul Hill," Fox, a Planned Parenthood escort, and one unidentified male in the vicinity of the minivan owned by Fox; and (4) a photograph taken by Rich on March 23, 1995 showing defendant, who was standing in the vicinity of Fox and two other persons, holding and pointing at a placard entitled "Safe and Legal?" and portraying an aborted fetus ("fetus placard"). Defendant presented three witnesses: (1) Kathryn Coons, an antiabortion protestor and the mother of Dinwiddie; and (2) Anthony Leake, an antiabortion protestor and a friend of Dinwiddie; and (3) defendant Dinwiddie.

The evidence unambiguously shows that defendant's activity at Planned Parenthood on March 23, 1995 violated the permanent injunction and 18 U.S.C. § 248.[2] Plaintiffs have shown by clear and convincing evidence that defendant is guilty of civil contempt. Dinwiddie used force, threats of force, or physical obstruction intentionally to intimidate, interfere with, or attempt to intimidate or interfere with the access of Davis, Fox, and Brown to and from the clinic entrance at Planned Parenthood.

### A. Davis

Davis' testimony concerned her attempt to exit the Planned Parenthood facility ("facility"). Davis exited and walked about one-fourth of the distance to her car when Dinwiddie came running around the side of a gate to intercept Davis and to thrust the fetus placard in Davis' face. As Dinwiddie thrust the fetus placard in Davis' line of vision and spoke in an increasingly loud volume, Davis attempted to reach her car while putting her head down. Dinwiddie continued to obstruct physically Davis' egress from the

---

**1.** All prior proceedings in this case have been civil as opposed to criminal. Likewise, the contempt hearing was a civil proceeding where plaintiffs sought civil remedies. *See generally* JACK H. FRIEDENTHAL, MARY KAY KANE & ARTHUR R. MILLER, CIVIL PROCEDURE § 15.8 at 715–20 (1985).

**2.** FACE provides criminal penalties and civil remedies against anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to interfere with any person because that person is or has been, or in order to intimidate such person or any person or any class of persons from, obtaining or providing reproductive health services ..." 18 U.S.C. § 248(a)(1).

facility and tried to prevent Davis from moving forward towards her car. Davis was precluded from walking around Dinwiddie because Dinwiddie repeatedly shifted her position and continually obstructed the way. Davis feared that Dinwiddie would make physical contact. When Davis finally reached her car, opened the door, and sat down, Dinwiddie prevented Davis from shutting the door by placing her body between the car frame and the car door. Dinwiddie finally moved to allow Davis to shut the door. Davis started the engine, rolled up the windows, and turned on the car radio. Nevertheless, Davis could still hear Dinwiddie, who was yelling and screaming at her. As Davis backed her car out of the parking lot, Dinwiddie stood between the car and the parking lot driveway. Davis inched her car around Dinwiddie to avoid hitting Dinwiddie.

Davis further testified: "I was very nervous as she [Dinwiddie] approached because I wasn't sure what to expect [and] I didn't know what she planned to do.... She was close enough to me to have hit me or pushed me." Davis affirmed that she was afraid for her physical safety. On her drive home, Davis "was shaking hard enough [that she] wondered if [she] should stop the car." Davis slept poorly during the following night as she mentally rehashed the incident.

## B. Fox

Fox's testimony concerned her attempt to enter the facility. Fox parked her minivan about seventy feet from the Planned Parenthood driveway on Harrison Street and turned off the engine. Dinwiddie, who appeared "agitated" and was yelling, appeared instantaneously and stood in the street three or four feet from Fox's minivan. Fox restarted her engine in order to lower the electric driver's window. Fox explained that before she got out of the minivan, she was concerned that Dinwiddie would interfere with her approach to the facility and wanted to warn Dinwiddie to stay away. Fox was afraid to get out of the minivan because Dinwiddie was so close, so loud, and so out of control. Fox eventually opened the door and tried to get out of the minivan. Dinwiddie immediately used her body to pin Fox into

the corner formed by the minivan and the open door for between thirty seconds and one minute. During that timespan, Dinwiddie yelled at Fox. Fox testified that she felt Dinwiddie was menacing her, singling her out by calling her by name, and was in essence attacking her. Fox also commented that Dinwiddie was very angry and yelling loudly.

Fox then attempted to proceed towards the facility. As Fox crossed Harrison Street and approached the sidewalk, Dinwiddie followed closely while yelling, carrying the fetus placard, and holding the fetus placard in front of Fox's face. Fox was unable to see past the fetus placard but tried to keep walking in the general direction of the facility. When Fox reached the sidewalk, Dinwiddie and Marge Herring, another antiabortion protestor, stood shoulder-to-shoulder directly in front of Fox. Fox requested that Dinwiddie get out of the way and to quit blocking her way to work. Despite this request, Dinwiddie did not move. Rather, Dinwiddie continued to yell and proceeded to take tiny steps at a pace that forced Fox to slow her walk to almost a standstill and precluded Fox from walking directly at a normal pace to the facility. In response to Dinwiddie's physical obstruction, interference with, and intimidation of Fox, a Planned Parenthood escort and another man "ran interference" by maneuvering their bodies so that Fox could make her way to the facility. On cross examination, Fox indicated that the amount of time that lapsed during her obstructed walk from the minivan to the facility was five times as long as an unencumbered walk and lasted about five minutes.

Fox testified that her feelings of fear were extremely high. Fox felt singled out by Dinwiddie, who was loud, physically close, angry, out of control, and continually thrusting the fetus placard in Fox's face. Fox "was really afraid [Dinwiddie] was going to hit me [Fox]" and "feared [she] was going to have a physical altercation with" Dinwiddie. Fox's fear stemmed directly from Dinwiddie's activity and the menacing delivery of Dinwiddie's message. Fox "thought at some point [she] might get struck [by Dinwiddie] with the [fetus placard ... and was worried because

Dinwiddie] was angrier, and louder, and closer" than ever before.

#### C. Brown

Brown's testimony concerned her attempt to enter the facility. Brown drove her car into the employee parking lot, got out, and started to walk towards the facility. Dinwiddie "made a b-line" towards Brown and thrust the fetus placard directly in Brown's face. Brown could not get around Dinwiddie, who was moving back-and-forth in front of and to the side of Brown. Brown said: "[E]xcuse me, I am trying to go to work." Dinwiddie, who was about a foot away, "screamed at the top of her voice: 'Getting to work on who[m]?'"

Brown stated that she felt disoriented, frightened, and afraid physically because she was unsure whether Dinwiddie was going to inadvertently or intentionally hurt her. Brown felt that Dinwiddie's speed, physical closeness, and incessant screaming would result in physical harm. Brown tried to block out Dinwiddie's screaming and closeness. Brown acknowledged that "when somebody is creating a lot of disturbance around you and you are trying to get around them, there is definitely potential for some kind of injury to happen." Brown said that Dinwiddie's physical obstruction, interference, and intimidation deterred her from entering the facility at a normal pace and that the help of escorts was required.

#### D. Credibility of Victims

In viewing the demeanor of Davis, Fox, and Brown ("victims") during the direct and cross examinations, the Court finds that each victim was highly credible. Each victim felt, or continues to feel, emotionally disconcerted, upset, or distraught by Dinwiddie's activity, which consisted of blatant and unambiguous violations of the permanent injunction and 18 U.S.C. § 248. Moreover, the testimony of the victims was corroborated by other witnesses and the photographs.

Davis' testimony was corroborated by Pamela Lyon and Clifford O'Rear. Lyon, for example, noted that Dinwiddie, with her body or the fetus placard, constantly blocked the path that Davis needed to travel to reach her car.

Fox's testimony was corroborated by Pamela Lyon, Tamara Morris, Clifford O'Rear, John Rich, and the photographs. Lyon testified that: (1) Fox tried to get out of the minivan but was blocked by Dinwiddie; and (2) Dinwiddie, who was within one foot of Fox, constantly blocked Fox's approach to the facility. Morris testified that Dinwiddie was: (1) continually within one foot of Fox and moved from side-to-side in front of Fox, who was focused on trying to make her way to the facility; and (2) "butt up against" Fox in order to impede Fox's progress down the sidewalk. O'Rear testified that: (1) he thought the scene was intimidating and threatening because Dinwiddie's nose was extremely close to Fox's face; (2) intimidation results when someone stands physically close to another's face, yells loudly and angrily, and breaks personal body space, as Dinwiddie did to Fox; and (3) when Fox finally entered the facility, she was upset, nervous, and frightened. Rich similarly testified that Dinwiddie's activity seemed very intimidating because Dinwiddie was so close to Fox.

Brown's testimony was corroborated by Clifford O'Rear. O'Rear testified that: (1) Dinwiddie ran up to Brown, thrust the fetus placard in Brown's face, and physically mirrored Brown's movements by moving in any direction Brown moved; (2) Brown eventually was able to reach the facility because an escort "ran interference" for Brown; and (3) upon reaching the facility, Brown was "shaken up …, intimidated …, quivering …, upset …, and frightened."

#### E. Defense Witnesses

The Court finds that the testimony of each victim, as corroborated by four eyewitnesses and the three photographs, was highly credible. In stark contrast, the testimony of the three defense witnesses was unbelievable. Coons and Leake: (1) denied hearing screaming or shouting by Dinwiddie; (2) maintained that Dinwiddie never interfered with ingress to or egress from the facility; (3) claimed that no victim appeared frightened or upset; and (4) stated that no victim changed her path or pace on the way to or from the facility. The Court finds that the testimony of Coons and Leake was complete-

ly unpersuasive and pales in comparison to the highly credible testimony of the victims. Dinwiddie portrayed her activity in an equally unpersuasive manner.

### F. Intent to Violate 18 U.S.C. § 248(a)(1)

■ Violations of 18 U.S.C. § 248(a)(1) require a finding of intent on the part of defendant. *See supra* note 2. The Court finds that the evidence presented at the civil contempt hearing shows unambiguously that Dinwiddie possessed the requisite intent to violate 18 U.S.C. § 248(a)(1) when she used force, threats of force, or physical obstruction to injure, intimidate, interfere with, or attempt to interfere with Davis, Fox, and Brown. Dinwiddie engaged in this illegal activity in order to dissuade the victims from performing their jobs at the facility. Dinwiddie's testimony reinforces the Court's finding on the issue of intent. Although Dinwiddie disagreed that her activity could be perceived as threatening, intimidating, or obstructive, she admitted that her intention on the morning of March 23, 1995 was to force the victims to think about what they were doing in providing reproductive health services at the facility and to dissuade them from doing it. The Court holds that there is absolutely no question that the evidence from the civil contempt hearing transcended the intent element of 18 U.S.C. § 248(a)(1).

### III. Civil Contempt

#### A. Intent

■ Distinct from the intent required to find a violation of 18 U.S.C. § 248(a)(1) is whether intent is an element of consideration in a civil contempt proceeding. Intent is immaterial in considering whether defendant violated the permanent injunction. An intention to violate a court order is not relevant to the finding that a civil, as distinguished from criminal, contempt has occurred.[3]

#### B. Sanctions

■ The imposition of sanctions for contempt of the permanent injunction lies within the broad, yet limited, discretion of the Court. The Court retains the inherent power to punish the contemnor, *see Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966), and 18 U.S.C. § 401[4] grants statutory authority for civil sanctions. The traditional options for civil contempt sanctions include coercive incarceration, coercive fines payable to the Court, compensatory fines payable to victims, fees and expenses of litigation, or modification of the permanent injunction. *See generally International Union, United Mine Workers of Am. v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

■ Despite this array of possibilities, this civil contempt order assesses only compensatory damages and attorney fees. Order (g) on pages 14 and 15 states that defendant shall be sanctioned for her violation of the permanent injunction by an amount equivalent to the sum of three distinct realms of damage.[5] The imposition of sanctions for these damages does not run afoul of the

---

**3.** *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) ("the absence of willfulness does not relieve from civil contempt"); *see also Universal Motor Oils Co., Inc. v. Amoco Oil Co.,* 743 F.Supp. 1484, 1486–87 (D.Kan.1990) ("[w]illfulness is not ... an element of civil contempt") (citing *TWM Manuf. Co. v. Dura Corp.,* 722 F.2d 1261, 1272–73 (6th Cir.1983)); *McGuffin v. Springfield Hous. Auth.,* 662 F.Supp. 1546, 1547 (C.D.Ill.1987) (beginning opinion by stating: "Violation of a Court order. Civil contempt? Just so. Court orders are to be complied with in *letter* and *spirit*—lack of scienter is beside the mark") (emphasis in original).

**4.** "A court of the United States shall have power to punish by fine or imprisonment, at its discre-

tion, such contempt of its authority, and none other, as.... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3).

**5.** Defendant's response to court's order for briefing filed April 6, 1995 attempts to articulate an argument concerning jury access and due process rights. Although counsel failed to specify the contours of the argument, such procedural protections and constitutional concerns are inapplicable to this case. First, the nature and purpose of the fines imposed on defendant in this civil contempt order fall well short of the boundary that differentiates civil contempt sanctions from criminal contempt sanctions. Second, the procedural posture of this case demonstrates that the sanctions stem from the violation of the per-

dichotomy between criminal and civil contempt fines. "A contempt fine ... is considered civil and remedial if it either coerce[s] the defendant into compliance with the court's order [or] compensate[s] the complainant for losses sustained." *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

### 1. Compensatory Damages to Victims

Defendant shall pay damages to the three victims to compensate them for her infliction of emotional distress. Such compensation must be reasonably calibrated to compensate the victims for defendant's noncompliance with the permanent injunction. *See* JACK H. FRIEDENTHAL, MARY KAY KANE & ARTHUR R. MILLER, CIVIL PROCEDURE § 15.8 at 716 (1985). Although there is a paucity of case law that addresses facts such as those present here, the Court, in receiving the suggestions and response suggestions specified in order (h) and order (i), will be receptive to quantifications, arguments, or estimates that analogize to awards for infliction of emotional distress in other civil contexts in order to make the victims whole for the contempt.

■ Defendant also shall pay damages beyond those discussed in the preceding paragraph to reflect defendant's intentional, willful, blatant, and repetitious violation of the permanent injunction on March 23, 1995. Granted, as indicated in part III.A of this civil contempt order, intent is immaterial in considering whether defendant violated the permanent injunction. However, intent and willfulness may be considered on the issue of appropriate compensatory damages.[6] The Court clarifies that this component of the compensatory damages to the victims is not punitive or prospective. However, compensatory damages should reflect the fact that defendant failed to exhibit any good-faith effort to comply with the permanent injunction and inflicted emotional distress intentionally on the victims.

### 2. Compensatory Damages to Planned Parenthood

■ Defendant shall pay compensatory damages to Planned Parenthood for the fair market value of the services of the three victims and other witnesses that were foregone to prepare for, and participate in, the civil contempt hearing. These damages should in essence reflect the opportunity cost of the witnesses' time as measured by their labor-market wage or salary. Compensation may be awarded to an injured party such as Planned Parenthood even though that party is not a named party to the underlying litigation. *See, e.g., McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (upholding contempt order requiring compensatory damages to be paid to injured non-party employees rather than to plaintiff, the Administrator of the Wage and Hour Division).

### 3. Attorney Fees and Costs to Plaintiffs

Defendant shall also pay damages equal to the costs, expenses, and attorney fees incurred by plaintiffs in any activity related to the civil contempt phase of this case, including but not limited to the motion, hearing, and post-hearing suggestions. "There are ample grounds for recognizing ... that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees," *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65

---

manent injunction rather than a "back-door" attempt by plaintiffs to seek statutory compensatory damages. The amended complaint sought only equitable remedies and the permanent injunction is a quintessential example of equitable relief. Defendant therefore enjoyed no constitutional right to a jury trial, as this Court noted in the preliminary injunction order filed on February 3, 1995. Defendant subsequently violated the permanent injunction. Plaintiff responded by seeking monetary damages for the violation. Plaintiff's motion to hold defendant in civil contempt and to award sanctions therefore represents a request in response to defendant's violation of the permanent injunction rather than a calculated back-door abridgement of defendant's constitutional protections and rights.

6. *See, e.g., Rogers v. Webster,* 776 F.2d 607, 612 (6th Cir.1985) ("[w]hile wilfulness is not an element of civil contempt, the contemnor's state of mind, such as his good faith or his reliance on the advice of counsel, is relevant in mitigation of any penalty") (citing *TWM Mfg. Co., Inc. v. Dura Corp.,* 722 F.2d 1261, 1273 (6th Cir.1983)).

L.Ed.2d 488 (1980), "even though the so-called 'American Rule' prohibits fee-shifting in most cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991).

These exceptions fall generally into three categories. *See id.; Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). One genre of exceptions to the American rule is that "a court may assess attorney's fees for the willful disobedience of a court order." *Chambers,* 501 U.S. at 45, 111 S.Ct. at 2133 (explaining that "a court's discretion to determine the degree of punishment for contempt permits the court to impose as part of the fine attorney's fees representing the entire cost of litigation") (internal quotations omitted).[7] The Court finds a plethora of evidence of willfulness and concludes that it existed. Moreover, federal courts of appeal have interpreted this genre of exceptions and the relevant case law to mean that, even in the absence of such a finding, attorney fees may be assessed against a contemnor.[8] The Court therefore finds more than ample justification in the case law to order defendant to pay damages equal to the costs, expenses, and attorney fees incurred by plaintiffs in the contempt phase of this case.

## C. Miscellaneous Motions

The Court denies as moot defendant's motion to strike filed March 24, 1995 ("motion to strike"), which asked the Court to strike a paragraph of plaintiff's motion for an order that defendant show cause why she should not be held in contempt of the permanent injunction.

The Court denies defendant's motion for stay of judgment pending appeal filed April 6, 1995 ("motion for stay"). The grounds cited in the motion for stay are unpersuasive.

The Court denies defendant's motion for reconsideration filed April 6, 1995 ("motion for reconsideration"). The primary ground for reconsideration is the argument set forth in *United States v. Wilson,* 880 F.Supp. 621, (E.D.Wis.1995) (holding that the portion of 18 U.S.C. § 248(a)(1) that proscribes non-violent physical obstruction of reproductive health services is unconstitutional under commerce clause analysis).[9] This Court, howev-

---

7. *See also Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) ("in a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant") (citing *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–28, 43 S.Ct. 458, 465–66, 67 L.Ed. 719 (1923)); *International Bhd. of Teamsters v. W. Penn. Motor Carriers Ass'n,* 660 F.2d 76, 84 (3d Cir.1981) (in action where association was held in civil contempt for failure to comply with injunctive order, district court did not abuse discretion by awarding local union reasonable attorney fees incurred in prosecuting contempt); *Parker v. United States,* 153 F.2d 66, 70 (1st Cir.1946) (fine in civil contempt proceeding "must not exceed the actual loss to the complainant caused by respondent's violation of the decree in the main cause *plus* complainant's reasonable expenses in the proceedings necessitated in presenting the contempt for the judgment of the court") (emphasis added).

8. *See, e.g., Robin Woods, Inc. v. Woods,* 28 F.3d 396, 400 (3d Cir.1994) ("we reject the notion that a finding of willfulness is a prerequisite to an award of attorneys' fees against the violator of an injunction"); *Sizzler Family Steak Houses v. West. Sizzlin Steak House,* 793 F.2d 1529, 1535 (11th Cir.1986) (noting that trial court has discretion to decide whether an award of attorney fees is appropriate and stating that "willfulness is

[not] necessarily a prerequisite to a fee award, but rather ... willfulness is a commonly accepted justification for awarding attorney fees"); *Perry v. O'Donnell,* 759 F.2d 702, 704 (9th Cir.1985) ("civil contempt need not be willful to justify a discretionary award of fees and expenses"); *Cook v. Ochsner Foundation Hospital,* 559 F.2d 270, 272 (5th Cir.1977) ("[i]t matters not whether the disobedience is willful[;] the cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order"); *see also Universal Motor Oils Co., Inc. v. Amoco Oil Co.,* 743 F.Supp. 1484, 1487 (D.Kan.1990) ("civil contempt need not be willful to justify a discretionary award of attorneys fees and expenses as a remedial measure"); *Hudson Transit Lines, Inc. v. Freund,* 509 F.Supp. 1172, 1178 (E.D.N.Y.1981) ("sanctions imposed after a finding of civil contempt ... [should] restore the parties to the position they would have held had the injunction been obeyed").

9. The congressional statement of purpose to FACE states: "it is the purpose of [FACE] to protect and promote the public safety and health and activities affecting interstate commerce ..." Pub.L. 103–259 § 2.

er, will not reconsider the constitutionality of the permanent injunction on commerce clause grounds. First, *Wilson* involved a criminal action and its facts are not apt to the facts presented here. Second, the Court remains persuaded by the commerce clause analysis articulated by the Fourth Circuit in *American Life League v. Reno,* 47 F.3d 642 (4th Cir.1995) (concluding that the commerce power permits Congress to regulate activities affecting reproductive health services).

Accordingly, it is ORDERED that:

(a) defendant's motion to strike is denied as moot; and

(b) defendant's motion for stay is denied; and

(c) defendant's motion for reconsideration is denied; and

(d) plaintiffs' motion to find defendant in contempt for violation of this Court's permanent injunction is granted; and

(e) the contours of the permanent injunction filed by this Court on March 21, 1995 are not modified in any way by the civil contempt phase of this case; and

(f) defendant, who has a continuing legal duty to comply with the permanent injunction, shall not in any manner whatsoever violate the permanent injunction or 18 U.S.C. § 248; and

(g) defendant shall be sanctioned for her violation of the permanent injunction by an amount equivalent to the sum of the: (1) compensatory damages suffered by the three victims because of defendant's infliction of emotional distress that reflects both nominal damages and the willfulness and deliberateness displayed by defendant's violation of the permanent injunction; (2) compensatory damages to Planned Parenthood for the fair market value of the services of the three victims and other witnesses that were foregone to prepare for, and participate in, the civil contempt hearing; and (3) damages equal to the costs, expenses, and attorney fees incurred by plaintiffs in any activity related in any way to the civil contempt phase of this case, including but not limited to the motion, hearing, and post-hearing briefs; and

(h) plaintiffs' counsel shall file suggestions ("suggestions") no greater than five pages in length, exclusive of and verified by supporting affidavits, that quantify all three types of damages specified in order (g), as explained in part III.B of this civil contempt order. Plaintiffs' counsel shall file the suggestions with the Court and shall send a copy via facsimile to defense counsel by April 21, 1995 at 4:00 p.m.; and

(i) defense counsel shall prepare suggestions ("response suggestions") no greater than five pages in length, exclusive of and verified by supporting affidavits, in response to plaintiffs' suggestions. Defense counsel shall file the response suggestions with the Court and shall send a copy to plaintiffs' counsel by April 28, 1995 at 4:00 p.m. Specifically, defense counsel shall not file the response suggestions at the United States Courthouse in St. Joseph, Missouri. Rather, defense counsel shall file the response suggestions in the Clerk's Office on the second floor of the United States Courthouse located at 811 Grand Avenue, Kansas City, Missouri, 64106.