**UNITED STATES of America, Plaintiff–Appellant,**

v.

**George WILSON, et al., Defendants–Appellees.**

**No. 95–1871.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1995.

Decided Dec. 29, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 21, 1996.*

* Circuit Judge Kenneth F. Ripple took no part in the consideration of this case.

Mel S. Johnson, Office of United States Attorney, Milwaukee, WI, Eileen Penner (argued), Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for U.S.

Robert J. Penegor, Carl W. Chesshir, Steven C. Spear, Brookfield, WI, for George L. Wilson.

Rene L. Wright (argued), Soldotna, AK, for John R. Stambaugh.

Brian Fahling (argued), Bruce W. Green, Stephen M. Crampton, American Family Association, Tupelo, MS, John J. Broderick, Syosset, NY, for Michael M. Skott.

Alexander Flynn (argued), Milwaukee, WI, for James A. Ketchum.

Robert C. Braun, West Allis, WI, pro se.

William R. Kerner (argued), Wauwatosa, WI, for Daniel J. Balint.

Lorie A. Chaiten, Camille E. Bennett, Sonnenschein, Nath & Rosenthal, Chicago, IL, David A. Strauss, University of Chicago Law School, Chicago, IL, for Planned Parenthood Federation of America, Incorporated, amicus curiae.

Deborah A. Ellis, New York City, Catherine Albisa, Center for Reproductive Law & Policy, New York City, for American College of Obstetricians and Gynecologists, American Civil Liberties Union Foundation, American Civil Liberties Union of Wisconsin, American Medical Women's Association, Feminist Majority Foundation, National Abortion Federation, National Center for the Pro Choice Majority, National Organization for Women, Incorporated, National Women's Law Center, Wisconsin National Organization for Women, Wisconsin Women's Network, Women's Law Project, Women's Legal Defense Fund, amicus curiae.

Before CUMMINGS, BAUER and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

At issue is the constitutionality of the Freedom of Access to Clinic Entrances Act ("Access Act"), 18 U.S.C. § 248, which proscribes physical obstruction of facilities providing reproductive health services. The dis-

trict court held that the Access Act exceeded Congress's power to legislate under both the Commerce Clause and Section 5 of the Fourteenth Amendment. *United States v. Wilson,* 880 F.Supp. 621 (E.D.Wis.1995). Every other federal court to address the issue has upheld the constitutionality of the Access Act, including two circuit courts. *American Life League, Inc. v. Reno,* 47 F.3d 642 (4th Cir.1995), certiorari denied, —— U.S. ——, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995); *Cheffer v. Reno,* 55 F.3d 1517 (11th Cir.1995).[1] We agree with these courts and reverse the district court's decision.

## I.

### Background

An FBI agent attested to the underlying facts. On the morning of September 29, 1994, the defendants blockaded the entrances of the Wisconsin Women's Health Care Center located in Milwaukee, Wisconsin. A Plymouth automobile was wedged into the front entry of the clinic, barring the doors and preventing egress from and ingress to the clinic. Three defendants welded themselves into the Plymouth with an interlocking steel apparatus. The upper body of one defendant protruded through a hole cut in the floor of the automobile and his lower body was on the ground underneath the car.

A second car blocked the rear door, pressing against it and preventing ingress and egress. The other three defendants welded themselves in various positions to and in the second car. One defendant was located in the driver's seat, restrained by a welded steel device confining his head in a steel harness, which was locked around his head by placing a car jack inside a hollow steel pipe. Another defendant was in a hole cut in the passenger-side floorboard, with his lower body resting on the pavement and his upper body confined inside an electric clothes dryer. His head was restrained in a locked harness secured around his throat. The third defen-

dant was in the right rear passenger seat with his arm encased and handcuffed inside a steel pipe.

From 6:30 a.m. to 11:00 a.m., Milwaukee firefighters used hydraulic equipment, blow torches, saws, and pry bars to extricate the defendants. During this time, two defendants told police officers and firefighters that they (the officers) were assisting in the murder of babies. Anti-abortion signs were displayed near the automobiles. During the blockade, neither clinic staff members nor patients could enter the building. The blockade barred 12 patients who had appointments between 7:00 a.m. and 11:00 a.m. from receiving scheduled abortions.

On September 30, 1994, the United States charged the six defendants with intentionally interfering with and intimidating persons seeking to provide and obtain reproductive health services in violation of the Access Act. Defendants were charged under Section 248(a)(1) of the Act, which subjects to criminal penalties whoever "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1).

## II.

### District Court Decision

The defendants moved to dismiss the charges, in part because the Access Act exceeded Congress's authority to legislate. A federal magistrate judge rejected the defendants' motion in an Order and Recommendation dated November 30, 1994. On March 16, 1995, the district court rejected the magistrate's recommendation and dismissed the charges, holding that Section 248(a)(1) of the Access Act is "unconstitutional and void." 880 F.Supp. at 623. Judge Randa rejected

---

1. The following district courts have found the Access Act to be a constitutional exercise of Congress's Commerce Clause power: *United States v. Dinwiddie,* 885 F.Supp. 1299 (W.D.Mo.1995); *United States v. Hill,* 893 F.Supp. 1034 (N.D.Fla. 1994); *Riely v. Reno,* 860 F.Supp. 693 (D.Ariz. 1994); *Cook v. Reno,* 859 F.Supp. 1008 (W.D.La. 1994); *Council for Life Coalition v. Reno,* 856 F.Supp. 1422 (S.D.Cal.1994); *United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995); *United States v. Lucero,* 895 F.Supp. 1421 (D.Kan.1995).

both bases of legislative power asserted by Congress: the Commerce Clause and Section 5 of the Fourteenth Amendment.

Under the Commerce Clause, the court stated that it would defer to a congressional finding that a regulated activity affects interstate commerce if there is a rational basis for the finding. The court interpreted the rational basis test to mean that "if the logic underlying the stated connection to interstate commerce would provide a basis for regulating any human activity, that logic is not rational within the context of the Constitution." *Id.* at 626. Applying the rational basis test, the district court found that the Access Act could only be justified as an activity "affecting commerce." *Id.* at 627 (citing the third of three categories reached by the Commerce Clause as outlined in *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). The court distilled three types of activities "affecting commerce" based on Supreme Court precedent and found that none compelled a finding of constitutionality: (1) trivial activity that undermines a national commercial regulatory scheme; (2) commercial activity that affects interstate travel; and (3) activity that employs violent means to achieve an economic purpose. 880 F.Supp. at 627–630.

The district court then declined to rely on four congressional findings to extend Supreme Court precedent, reasoning that relying on any of the four findings would be a basis for federal regulation of any human activity. First, the finding that abortion clinics operate within the stream of interstate commerce does not differentiate other human activities, because "*all* persons and *all* entities operate within the stream of commerce." *Id.* at 630. Second, the finding that some individuals cross state lines to provide or obtain abortions is not limited, given the high mobility of our society. Third, Congress found that obstructing access to abortion clinics decreases the number of abortions performed and therefore negatively impacts interstate commerce. The district court reasoned that this finding is also limitless, because it would allow Congress to regulate any activity that decreases the sale or purchase of specific goods, including shoplifting.

Finally, the court rejected Congress's finding that the problem is national in scope and beyond the ability of the states to control as irrelevant to the question whether the Access Act substantially affects interstate commerce.

### III.

### Discussion

### A.

 We review a determination of the constitutionality of a federal statute de novo. *Smith v. Shalala,* 5 F.3d 235, 238 (7th Cir. 1993), certiorari denied, —— U.S. ——, 114 S.Ct. 1309, 127 L.Ed.2d 660 (1994). Our jurisdiction is premised on 28 U.S.C. § 1291.

Congress passed the Access Act to address a nation-wide campaign of blockades, invasions, vandalism, threats, and other violence barring access to reproductive health facilities. H.R.Rep. No. 306, 103d Cong., 2d Sess. 6 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 703. Congress found that more than 1,000 acts of violence against providers of reproductive health services were reported in the United States from 1977 to April 1993, including "at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic 'invasions,' and one murder." In addition, more than 6,000 blockades and other disruptions have been reported since 1977. H.R.Rep. at 6–7, 1994 U.S.C.C.A.N. at 703–704.

Congress found that state and local law enforcement agencies have failed to address effectively the nationwide assault on reproductive health facilities and that local laws such as trespass, vandalism, and assault have proven inadequate to address the problem. H.R.Rep. at 10, 1994 U.S.C.C.A.N. at 707; see also S.Rep. No. 117, 103d Cong., 1st Sess. 3, 18–21 (1993). Federal law was also inadequate. Prior to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), federal courts enjoined the conduct described above pursuant to 42

U.S.C. § 1985(3),[2] but *Bray* denied a remedy under that statute to persons injured by the obstruction of access to abortion-related services. H.R.Conf.Rep. No. 488, 103d Cong., 2d Sess. 7 (1994), reprinted in 1994 U.S.C.C.A.N. 699, 724.

Congress enacted the Access Act to protect and promote public safety and health "by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services." Pub.L. No. 103–259, § 2 (1994). Thus the Act provides civil and criminal penalties against anyone who:

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; * * * or

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services * * *

18 U.S.C. § 248(a).[3]

### B.

The defendants charged under the Access Act succeeded in arguing below that Congress lacked authority to regulate activities affecting reproductive health services. Congress asserted authority under the Commerce Clause and Section 5 of the Fourteenth Amendment to enact the Access Act.

Pub.L. No. 103–259, § 2. On appeal, the Government argues that the district court erred in rejecting both constitutional bases of congressional authority. Because we conclude that Congress had authority under the Commerce Clause, we express no opinion regarding the district court's Fourteenth Amendment discussion.[4]

The Supreme Court applies the same general framework for analyzing Commerce Clause challenges as the district court in this case. Congress may regulate under its commerce power in three broad categories. First, it may regulate the use of the channels of interstate commerce. Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Third, Congress may regulate those activities having a substantial relation to interstate commerce—those activities that substantially affect interstate commerce. *United States v. Lopez*, —— U.S. ——, —— – ——, 115 S.Ct. 1624, 1629–1630, 131 L.Ed.2d 626 (1995); *Perez*, 402 U.S. at 150, 91 S.Ct. at 1359–1360. The judiciary will make an independent inquiry into the constitutionality of a statute under the Commerce Clause, but the court will consider congressional findings, including congressional committee findings. —— U.S. at ——, 115 S.Ct. at 1631. However, in category three cases, "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* at —— n. 2, 115 S.Ct. at 1629 n. 2 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 311, 101 S.Ct. 2352, 2374, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring

---

**2.** Section 1985(3) proscribes depriving persons of rights or privileges.

**3.** The statute also defines several key terms. "Facility" includes "a hospital, clinic, physician's office, or other facility that provides reproductive health services...." "Reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of pregnancy." "Interfere with" means "to restrict a

person's freedom of movement." "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." "Physical obstruction" means "rendering impassable ingress to or egress from a facility ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." 18 U.S.C. § 248(e).

**4.** We fail to see how the dissent can avoid the Fourteenth Amendment issue, however, since Section 5 provides an independent basis of legislative power.

in judgment)). Permitting Congress to proclaim the extent of its own power would violate the principle of judicial review set out in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Therefore, courts will decide whether a rational basis exists for concluding that a regulated activity substantially affects interstate commerce. ——— U.S. at ———, 115 S.Ct. at 1629 (citing, *inter alia,* *Hodel,* 452 U.S. at 276–280, 101 S.Ct. at 2360–2361).

■ We agree with the district court that the Access Act does not regulate the channels of interstate commerce within the meaning of the first category.[5] However, we disagree with the district court's reasoning under the third category and hold that the Access Act is constitutional as a regulation that substantially affects interstate commerce.[6] Finally, although we decline to decide whether the Act fits within the second category, the applicability of that category warrants more careful consideration than that offered by the district court.

### 1.

■ Congress made four basic findings regarding the interstate nature of the regulated activities under the Access Act. These findings are plainly rational, and the first three reveal the regulated activities' substantial relation to interstate commerce. While the fourth finding does not independently satisfy the substantial effects test, it serves to confirm the interstate nature of the problem Congress sought to address in the Access Act.

First, Congress found that reproductive health facilities operate within the stream of interstate commerce and that the activities proscribed by the Act bring the commerce of a targeted facility to a halt. Congress found that reproductive health facilities acquire equipment, "medicine, medical supplies, surgical instruments and other necessary medical products ... from other States," S.Rep. at 31, and that the conduct proscribed by the Act burdens "the interstate commercial activities of health care providers, including the purchase and lease of facilities and equipment, sale of goods and services, employment of personnel and generation of income, and purchase of medicine, medical supplies, surgical instruments and other supplies from other states." H.R.Conf. at 7, 1994 U.S.C.C.A.N. at 724. Blockading prevents health care providers from rendering, and patients from receiving, the commercial services offered at such facilities. S.Rep. at 7; H.R.Rep. at 6, 1994 U.S.C.C.A.N. at 703.

The finding that reproductive health facilities are engaged in interstate commerce is rational. Such facilities will obviously purchase, use, and distribute goods from other States. This places the facilities "in commerce" as that concept is generally understood. See *United States v. Robertson,* ——— U.S. ———, ———, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (citing *United States v. American Bldg. Maintenance Indus.,* 422 U.S. 271, 283, 95 S.Ct. 2150, 2158, 45 L.Ed.2d 177 (1975) ("To be engaged 'in commerce' ... a corporation must itself be directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce."); *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398–399, 42 L.Ed.2d 378 (1974)). Obstruction of those

---

**5.** The first category is limited to regulation of the misuse of channels of interstate commerce. *Perez,* 402 U.S. at 150. Examples include the shipment of stolen goods, 18 U.S.C. § 2314, et seq.; kidnapped persons, 18 U.S.C. § 1201, et seq.; prostitutes, 18 U.S.C. § 2421, et seq.; and guns, 18 U.S.C. § 922, et seq. See *Wilson,* 880 F.Supp. at 627.

**6.** In addition to finding that Congress rationally concluded that the Access Act regulates activities substantially related to interstate commerce, we also find that Congress chose a regulatory means reasonably adapted to a permissible end. Both findings are required to hold the statute constitutional. *Hodel,* 452 U.S. at 276, 101 S.Ct. at

2360. We agree with the Fourth Circuit that the Access Act's criminal and civil penalties are designed to deter violent, obstructive behavior and are reasonably adapted to five permissible ends: "(1) protecting the free flow of goods and services in commerce, (2) protecting patients in their use of the lawful services of reproductive health facilities, (3) protecting women when they exercise their constitutional right to choose an abortion, (4) protecting the safety of reproductive health care providers, and (5) protecting reproductive health care facilities from physical destruction and damage." *American Life League,* 47 F.3d at 647.

facilities, which the Access Act proscribes, essentially brings the interstate commercial activity at the targeted facility to a halt. Congress has authority under the Commerce Clause to proscribe activity that interferes with interstate commerce. *United States v. Coombs,* 37 U.S. (12 Pet.) 72, 78, 9 L.Ed. 1004 (1838).

The district court dismissed Congress's finding as a statement of the obvious—a limitless rationale that would justify any regulation, because *"all* persons and *all* entities operate within the stream of commerce." 880 F.Supp. at 630. By rejecting Congress's finding out of hand, the district court erred in failing to address whether the regulated activities *substantially* affect interstate commerce. Since *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), repudiated the direct/indirect test under the Commerce Clause, the substantial effects test has been used to limit congressional authority. This change was largely do to the new national economy in which, indeed, all persons and all entities operate within the stream of commerce. See *Lopez,* —— U.S. at ——, 115 S.Ct. at 1628. Thus courts must ask the additional question whether the relation to interstate commerce is substantial. The district court erred further by giving no deference to Congress's finding. Courts need only look for a rational basis. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. The district court essentially converted the rational basis test into a less deferential standard. Here it is plainly rational that reproductive health facilities are engaged in interstate commerce and that obstruction of such facilities brings the commerce to a halt.

Second, Congress found that individuals travel interstate to obtain and provide reproductive health services: "[M]any of the patients who seek services from [abortion providers] engage in interstate commerce by traveling from one state to obtain [the abortion services] in another." S.Rep. at 31; see also H.R.Rep. at 10, 1994 U.S.C.C.A.N. at 707. The district court was unpersuaded by this finding, given society's high mobility: "If some people cross state lines to go golfing, bowling, camping or shopping, can Congress regulate these activities?" 880 F.Supp. at 631. Again, the district court erred by failing to apply the substantial effects test to Congress's finding. If individuals travel interstate more often to seek and provide reproductive health services than to bowl or to camp, Congress's authority to regulate may very well reach health facilities but not bowling alleys or campgrounds: courts must apply the substantial effects test to draw the proper distinction.

A rational basis exists for finding that interstate travel of individuals seeking reproductive health services is substantial, and that obstructing those individuals therefore substantially affects interstate commerce. Congress noted that most facilities are located in urban centers and that only 17 percent of all U.S. counties have facilities. Thus "rural clinics and doctors have become the preferred targets for abortion foes because elimination of that single provider effectively eliminates service for many women." H.R.Rep. at 8, 1994 U.S.C.C.A.N. at 705. Further, Congress noted that clinic owners face shortages of doctors willing to perform abortions. *Id.* Thus, unlike bowling and other activities, the unique scarcity of certain reproductive health services necessitates substantial interstate travel. In addition, several courts have recognized the substantial interstate travel involved in reproductive health care. See *Bray,* 506 U.S. at 274, 113 S.Ct. at 762 (Stevens, J., dissenting) ("Between 20 and 30 percent of the patients at a targeted clinic in Virginia were from out of State and over half of the patients at one of the Maryland clinics were interstate travelers."); *National Org. for Women v. Operation Rescue,* 726 F.Supp. 1483, 1489 (E.D.Va. 1989) ("[S]ubstantial numbers of [abortion] clinics in the Washington Metropolitan area travel interstate to reach the clinics.") (subsequent history omitted); see also *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1360 (2d Cir.1989), certiorari denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Women's Health Care Servs. v. Operation Rescue,* 773 F.Supp. 258, 266–267 (D.Kan.1991), reversed on other grounds, 24 F.3d 107 (10th Cir.1994); *Margaret S. v. Edwards,* 488 F.Supp. 181, 212 (E.D.La.1980).

Third, Congress found that obstruction of facilities decreases the overall availability of reproductive health services nationwide. Congress heard testimony from which it concluded that "the avowed purpose of this conduct is to eliminate ... abortion services" altogether "by closing clinics and intimidating doctors." S.Rep. at 11. A leader of Operation Rescue told Congress that his purpose was "to see abortion clinics stopped ... closed down," and another leader stated, "We may not get laws changed or be able to change people's minds, ... but if there is no one willing to conduct abortions, there are no abortions." S.Rep. at 11. Congress found evidence that the campaign was succeeding: "This conduct has forced clinics to close.... It has also taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers." S.Rep. at 14. As stated above, only 17 percent of all U.S. counties have reproductive health facilities and clinic owners face shortages of doctors willing to perform abortions. H.R.Rep. at 8, 1994 U.S.C.C.A.N. at 705.

The district court rejected this finding, stating that it would justify giving Congress the unprecedented power "to regulate any human activity which arguably decreases the sale or purchase of specific goods or services[.]" 880 F.Supp. at 631. The district

court again erred in not asking the relevant question—whether obstruction of reproductive health facilities *substantially* affects interstate commerce. A mere decrease in the sale or purchase of goods or services would not qualify, of course, but the district court failed to consider that the Access Act might address a substantial threat to commerce. Indeed, the evidence Congress relied upon reveals a substantial threat to the national reproductive health services market. It is this threat to a national market, which Congress found to be scarce and declining in availability, that distinguishes Congress's authority to regulate in this case from its probable lack of authority to regulate, for example, shoplifting (cited by the district court, 880 F.Supp. at 631 n. 17, because it "reduces the supply of goods" [7]).

Fourth, Congress found that obstruction of facilities is a nationwide problem that is beyond the control of individual states. Congress heard testimony that organizations like Operation Rescue engage in national campaigns to close abortion clinics. Congress cited examples of national campaigns targeted at clinics in Wichita, Buffalo, Dobbs Ferry, and at the only clinic in North Dakota: "Hundreds of people came from across the country and engaged in acts of trespass and obstruction that overwhelmed local law enforcement's ability to respond." H.R.Rep. at

7. The district court's other examples—use of cabs and busses, dieting, breast-feeding, video rentals, and computers and computer software, 880 F.Supp. at 631 n. 17—suffer from the same infirmity: the court assumes that Congress's finding justifies its authority to regulate reproductive health facilities because obstruction of facilities merely decreases the availability of reproductive health services. This assumption is wrong. Congress's authority is based on evidence that obstruction of facilities *substantially* decreases the market for reproductive health services. The district court's application of its understanding of the rational basis test—that a finding must be rejected "if the logic underlying the stated connection to interstate commerce would provide a basis for regulating any human activity," 880 F.Supp. at 626—is seriously flawed. It is easy enough to analyze a finding, as the district court did, at the highest level of generality to find it applicable in virtually every situation. But the rational basis test, properly applied, is very different: it requires courts to defer to Congress on a case-by-case basis when Congress's findings reveal a *substantial* relation to interstate

commerce. Thus the rational basis test, focusing as it does on the substantial nature of the relation to interstate commerce in an individual case, operates at a much lower level of generality.

The dissent's review of Congress's findings is in the same vein as the lower court's review. The inappropriately non-deferential and result-oriented nature of the dissent's analysis is revealed by its suggestion that, because the *dissent* believes the Access Act is not substantially related to interstate commerce, Congress's findings should be reviewed with greater scrutiny than required by the rational basis test: "I realize that this analysis of the congressional record may be criticized as 'strict scrutiny,' and not the rational basis inquiry which is proper under the Commerce Clause. However, because the acts prohibited by 18 U.S.C. § 248 (acts of civil disobedience) are in no meaningful sense motivated by or directed at interstate commerce (as the services of abortion providers sometimes are), I believe that the findings, relied upon by our supreme legislative body and by the majority, should be evaluated carefully and not accepted at face value." (Dissent, at pp. 697–698).

7, 1994 U.S.C.C.A.N. at 704. Congress found that clinic blockading typically involves hundreds, or even thousands, of people trespassing, blocking entrances, and interfering with the efforts of health care providers. *Id.;* S.Rep. at 7. One court noted that during a "rescue" by anti-abortion activists seeking to close a clinic, "hundreds and perhaps thousands of persons came to Wichita from across the nation to engage in such activity." *United States v. Cooley,* 787 F.Supp. 977, 980 (D.Kan.1992), vacated on other grounds, 1 F.3d 985 (10th Cir.1993) (further subsequent history omitted). Congress also heard extensive testimony about the inability and unwillingness of local law enforcement to respond effectively to "the systematic and nationwide assault that is being waged against health care providers and patients." S.Rep. at 19, 21; H.R.Rep. at 6, 1994 U.S.C.C.A.N. at 703.

We agree with the district court that this finding, standing alone, does not justify Congress's power to enact the Access Act. As the district court noted, it is not enough that a problem is national in scope or that local officials are unable to control the problem.[8] 880 F.Supp. at 631. Rather, the activities must substantially affect interstate commerce. Thus Congress's finding that the problems at reproductive health facilities are national in scope adds little to the relevant inquiry. The district court, however, failed to note the crux of Congress's finding: the essence of the finding is not that the problem is national in scope, but that the effort to close reproductive health facilities is organized on a national scale. In other words, Congress was addressing an interstate problem rather than a multistate, intrastate problem. Nonetheless, while this fact adds little to Congress's other findings, it does help confirm that Congress properly sought to address a truly interstate problem by enacting the Access Act.

These findings demonstrate that the Access Act falls well within Congress's Commerce Clause power to regulate activities that substantially affect interstate commerce. Defendants argue, however, that the Su-

preme Court's recent decision in *Lopez, supra,* compels a different result. Despite defendants' best efforts, we find that *Lopez* is easily distinguished from this case. In *Lopez,* the Court invalidated the Gun–Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A). Congress made no findings relevant to its Commerce Clause power in enacting the Gun–Free School Zones Act. In particular, it was conceded that neither the statute nor its legislative history contained any findings about the effects on interstate commerce of gun possession near schools. —— U.S. at ——, 115 S.Ct. at 1631. The Court held the statute unconstitutional as exceeding Congress's Commerce Clause power because it did not involve commerce or any other economic enterprise within the meaning established by prior caselaw and because it contained no jurisdictional element to ensure, case-by-case, that the regulated activity affected interstate commerce. *Id.* at ——–——, 115 S.Ct. at 1630–1631.

We agree with the Eleventh Circuit that the Access Act, unlike the Gun–Free School Zones Act, regulates a commercial activity— the provision of reproductive health services. *Cheffer,* 55 F.3d at 1520–1521. Reproductive health clinics engage in interstate commerce by purchasing, using, and dispensing goods that have travelled in interstate commerce. Their commercial activity also includes owning and leasing office space, employing staff, and generating income. The Access Act regulates this commercial activity by preventing its obstruction. Moreover, Congress's findings reveal that there exists a substantial interstate market for reproductive health services. Largely because of the scarcity of certain services, women seeking health services and providers of such services travel interstate. The Access Act helps ensure that these individuals are able to engage in this interstate commercial activity. The Act by

---

8. The inability or unwillingness of local officials to respond effectively might give Congress the power to legislate under Section 5 of the Fourteenth Amendment if the conduct of local officials amounts to state action. As stated above, though, we do not reach the Fourteenth Amendment issue in this case.

its terms prohibits interference with persons because they are engaging in commercial activity. See 18 U.S.C. § 248(a)(1) (prohibiting interference with "persons ... obtaining or providing reproductive health services").

*Lopez* is also distinguishable because in enacting the Access Act, unlike the Gun-Free School Zones Act, Congress made specific findings regarding the substantial effect on interstate commerce. Although the Supreme Court stated that Congress is normally not required to make specific findings, —— U.S. at ——, 115 S.Ct. at 1631 (citing *Perez*, 402 U.S. at 156, 91 S.Ct. at 1362), it noted that congressional findings would be helpful when it is not "visible to the naked eye" that the activity in question substantially affects interstate commerce. *Id.* at ——, 115 S.Ct. at 1632. It is easy enough to imagine congressional findings that, if found rational, could have made *Lopez* a very different case. Hypothetically, Congress might have produced reliable data showing that possession of guns closed down 20% of urban schools and, as a result, low productivity among the citizenry in certain regions hampered commerce. The point is that congressional findings matter. Because Congress made numerous, specific findings regarding the Access Act, the courts are not left to imagine—as in *Lopez*—how the regulated activities affect interstate commerce.

Defendants make several specific arguments regarding the applicability of *Lopez.* Only two of defendants' contentions warrant discussion.[9] First, they argue that the Access Act, like the Gun–Free School Zones Act, "is a criminal statute that by its terms has nothing to do with 'commerce'...." —— U.S. at ——–——, 115 S.Ct. at 1630–1631. The Court in *Lopez* noted that States possess primary authority for defining and enforcing the criminal law, and that when Congress

criminalizes activity it upsets the relation between federal and state criminal jurisdictions.[10] *Id.* at —— n. 3, 115 S.Ct. at 1631 n. 3. *Lopez,* however, did not call into question the well-established principle that Congress may regulate conduct even though that conduct already violates state law:

> The Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers.... It would [ ] be a radical departure from long-established precedent for this Court to hold that the Tenth Amendment prohibits Congress from displacing state police power laws regulating private activity.

*Hodel,* 452 U.S. at 291–292, 101 S.Ct. at 2368; see also *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 1116–1117, 55 L.Ed.2d 349 (1978) (rejecting concern that Congress disturbed federal-state balance where Congress clearly intended to criminalize conduct already criminal under state law).

Second, defendants argue that the Access Act, like the Gun–Free School Zones Act, regulates only noncommercial activity—protesting at abortion clinics. The district court invoked the same argument: Congress is impermissibly regulating private conduct that affects commercial entities rather than commercial entities themselves. 880 F.Supp. at 628. There is no authority for the proposition that Congress's power extends only to the regulation of commercial entities. To the contrary, courts have upheld numerous statutes which regulate private conduct that affects commercial entities or commercial activity. For example, *Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), upheld a conviction un-

9. Defendants have argued, for example, that the legislators enacting the Access Act were biased against opponents of abortion. Even assuming defendants are correct, the assertion is not relevant to the Commerce Clause inquiry. See *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 257–258, 85 S.Ct. 348, 357–58, 13 L.Ed.2d 258.

10. The dissent makes much of the disruption of the federal/state balance, relying on Justice

Thomas's *Lopez* dissent, Justice Powell's dissent in *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and Federalist No. 45—among others. That the Seventh Circuit may rely on these authorities and ignore a host of binding Commerce Clause cases is wishful thinking employed for the purpose of inexorably achieving a preferred result. In defining the contours of federalism, this Court is not writing on a clean slate.

der 18 U.S.C. § 844(i), which penalizes a person who damages or destroys by fire or explosives any property used in any activity affecting interstate commerce. See *Cheffer*, 55 F.3d at 1520 n. 6, for other examples.

The dissent mischaracterizes *Lopez* as holding "that only two types of federal regulation may be justified on the grounds that a regulated activity 'substantially affects interstate commerce' ": (1) federal criminal statutes that include a jurisdictional element, ensuring that the proscribed conduct substantially affects interstate commerce; and (2) regulations that reach economic activity that substantially affects interstate commerce. In no such way did *Lopez* delineate the substantial effects test. In discussing the lack of a jurisdictional element in *Lopez*, the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional. — U.S. at —, 115 S.Ct. at 1631. Read in context, the Court simply stated that the Gun–Free School Zones Act, unlike the statute in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), lacks a jurisdictional element to "ensure" constitutionality, not to fulfill a prerequisite of constitutionality. See *Lopez*, — U.S. at —, 115 S.Ct. at 1631. Regarding the dissent's interpretation of the second *Lopez* category, we find no support for reading *Lopez* as permitting only regulation *of* economic activities exclusive of regulations that reach or affect economic activities. The Court's language is clear that the substantial effects test is not so limited: it concluded that the firearms statute could not "be sustained under our cases upholding regulations of activities that *arise out of or are connected with* a commercial transaction, *which viewed in the aggregate, substantially affects interstate commerce.*" *Id.* (emphasis added). The dissent seemingly misreads the Court's discussion of *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), which the Court distinguished on economic activity grounds, as delimiting the substantial effects test, see *id.* at — – —, 115 S.Ct. at 1630–1631; however, the Court's subsequent discussion (quoted above) belies the dissent's interpretation. Unlike the dissent, this Court will not read such a dramatic change into the law by selectively relying on Supreme Court statements plucked from their context.

Aside from the alleged similarities between the Access Act and the Gun–Free School Zones Act, defendants claim that *Lopez* worked a fundamental change in Commerce Clause jurisprudence. The dissent apparently agrees. *Lopez* is no doubt significant as one of the only cases to hold that Congress exceeded its Commerce Clause authority since *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), struck down federal wage and hour regulations. But the Supreme Court reaffirmed, rather than overturned, the previous half century of Commerce Clause precedent in *Lopez*. As the Court's detailed tracing of Commerce Clause jurisprudence readily concedes, the foundation of cases like *Schechter Poultry*—that activities affecting interstate commerce directly are within Congress's power, but activities affecting interstate commerce only indirectly are not—has completely eroded. *Jones & Laughlin, supra; Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 89 (expressly repudiating the direct/indirect distinction). The substantial effects test now defines the limits of the commerce power.

Because the Supreme Court left intact *Jones & Laughlin* and all its progeny, which includes cases such as *Wickard* and *Lopez*, it obviously did not intend *Lopez* to be a departure from established Commerce Clause precedent. See — U.S. at —, 115 S.Ct. at 1637 (Kennedy, J., concurring). *Lopez* is primarily significant because it helps define the line between what Congress may regulate and what it may not. The line certainly preexisted *Lopez*. See *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195, 6 L.Ed. 23 (1824): ("The enumeration [of powers] presupposes something not enumerated...."). Now, courts facing Commerce Clause challenges must reconcile *Lopez* with a long line of cases that construed the Commerce Clause expansively. Adhering to *Lopez* while preserving sixty years of Commerce Clause precedent is, fortunately, not difficult in this case.

**685**

Contrary to defendants' assertions, the Access Act falls far short of the line crossed by the Gun–Free School Zones Act in *Lopez*.

In the end, *Lopez* is a significant case—or as the dissent states, a "landmark"—because it did what had not been done for decades. But the Supreme Court left intact and relied on decades of Commerce Clause jurisprudence. Unlike the dissent, we are guided both by what the Supreme Court did and did not do in *Lopez*.

### 2.

Although we conclude that the Access Act is constitutional because it regulates activity that substantially affects interstate commerce, the Government argues that the Act also qualifies under the second category as a regulation of an instrumentality of interstate commerce. The district court dismissed the second category without discussion. 880 F.Supp. at 627. The Government argues on appeal that the district court erred, relying on the *Lopez* Court's verbal formulation of the second category: "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or *persons or things in interstate commerce,* even though the threat may come only from intrastate activity." —— U.S. at ——, 115 S.Ct. at 1629 (emphasis added in Government's brief). The Government argues that the Access Act protects persons in interstate commerce, by prohibiting interference with individuals because they are obtaining or providing reproductive health services, and things in interstate commerce, by prohibiting obstruction that prevents commerce in goods used and dispensed by reproductive health facilities. Applicability of the second category warrants more careful consideration than that given by the district court.

The Government's argument is persuasive if *Lopez*'s verbal formulation of the second category, essentially dicta, is interpreted literally. As such, Congress could enact legislation that affects intrastate threats to interstate commerce in six subcategories: (1) to regulate the instrumentalities of interstate commerce; (2) to protect the instrumentalities of interstate commerce; (3) to regulate persons in interstate commerce; (4) to protect persons in interstate commerce; (5) to regulate things in interstate commerce; and (6) to protect things in interstate commerce. The Government places the Access Act within two of these subcategories. First, because Congress found that substantial numbers of women travel interstate to seek abortion services, S.Rep. at 31, the Act protects persons in interstate travel (number four). Second, because Congress found that goods used and dispensed by the facilities travel in interstate commerce, *id.,* the Act protects things in interstate commerce (number six).

The Supreme Court articulated the three categories of commerce power in *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359–1360. The cases cited in support of the second category in *Perez* and *Lopez* do not clearly support the six subcategories derived from a literal reading of *Lopez*. The first issue, therefore, is whether the precedent cited by the Supreme Court supports any or all of the six subcategories, *i.e.,* whether the Court meant what it said in *Lopez* with regard to the second category. In support of the second category, the Court has cited *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), *Southern Ry. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911), and two examples cited in *Perez,* the destruction of an aircraft (18 U.S.C. § 32) and thefts from interstate shipments (18 U.S.C. § 659). —— U.S. at ——, 115 S.Ct. at 1629.

In *Shreveport,* the Court upheld rate restrictions on railroads travelling between Texas and Louisiana even though the restrictions effectively abrogated rates set for intrastate travel, holding that Congress's "authority, extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic...." 234 U.S. at 351, 34 S.Ct. at 836. *Shreveport* thus involved only a regulation of an instrumentality of interstate travel (number one).

In *Southern Railway,* the Court upheld the Safety Appliance Acts, even though the Acts would apply to railroads moving in interstate and intrastate traffic. The rationale

for the holding was based on an affirmative answer to the following question: "Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in [both interstate and intrastate traffic]?" 222 U.S. at 26, 32 S.Ct. at 4. The Acts upheld thus protected instrumentalities of interstate commerce (the railroad cars), people in interstate commerce (railroad workers), and things in interstate commerce (cargo) (numbers two, four, and six).

Finally, the *Perez* Court cited two federal statutes as regulations of instrumentalities of interstate commerce. The statute prohibiting destruction of an aircraft, 18 U.S.C. § 32, protects an instrumentality of interstate commerce (the airplane), people in interstate commerce (passengers), and things in interstate commerce (cargo) (numbers two, four, and six). The statute forbidding thefts from interstate shipments, 18 U.S.C. § 659, protects only things in interstate commerce (number six).

In sum, all but subcategories three and five appear in the Court's examples of category two cases. Because those subcategories are not at issue here,[11] we find that the Government's literal reading of *Lopez*'s characterization of category two is plausible. The defendants' contention that category two is inapplicable because the Access Act does not regulate an instrumentality of interstate commerce ignores the language of *Perez* and *Lopez* that includes within category two the protection of persons and things. As demonstrated above, inclusion of the language "persons and things" was likely based on precedent—not happenstance. The second issue,

therefore, is whether the protection of persons and things under the Access Act is analogous to the protection of persons and things in *Southern Railway,* 18 U.S.C. § 32, and 18 U.S.C. § 659.

The Government must show that persons seeking to obtain or provide reproductive health services are "in interstate commerce" in the same manner that the railroad workers in *Southern Railway* and the airline passengers protected by 18 U.S.C. § 32 are "in interstate commerce." As stated above, there is a rational basis for Congress's finding that a substantial number of women travel interstate for reproductive health services. Further, it makes no difference that the Access Act primarily protects persons in intrastate commerce. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1626 (Congress may regulate in the third category, "even though the threat may come only from intrastate activities."). We believe, however, that the protection of persons in these examples is necessarily tied to regulation of an instrumentality of interstate commerce, like a railroad car or an airplane. The protection of persons in both examples is only a subordinate justification of Congress's power, which clearly extends, without need of further justification, to the regulation and protection of railroad cars and airplanes travelling interstate. Under the Access Act, however, the Government is forced to argue that protection of persons is the primary justification of Congress's power. Without further clarification from the Supreme Court, we decline to hold that protection of persons in interstate travel can be the exclusive source of congressional authority to enact the Access Act.[12]

On the contrary, the protection of things in interstate commerce is not so clearly tied to regulation of an instrumentality. Congress has criminalized the theft of goods in interstate travel, including theft of goods from a

11. Regulating persons and things in commerce may not be conceptually distinct from protecting persons and things in commerce.

12. This analysis, of course, collapses the protection-of-persons subcategory back into the subcategories for protection and regulation of instrumentalities, which belies a literal reading of *Lopez* on this issue. We decline to resolve such an important question without further guidance

from the Supreme Court where, as here, there is little precedent to consult regarding the limits of category two cases and resolution is irrelevant to the disposition of this case. Given the Government's argument under category two both in its brief and at oral argument, we do see value in exposing the confusion under category two.

"storage facility, station, station house, platform or depot...." 18 U.S.C. § 659, cited in *Perez*, 402 U.S. at 150, 91 S.Ct. at 1359–1360. Unlike the statute in *Southern Railway* and the aircraft destruction statute, Section 659 protects interstate goods without regard to their actual presence on an instrumentality of interstate commerce. Thus protection of interstate goods is the primary justification for Congress's power to criminalize the theft of goods from storage facilities. Unlike the protection-of-persons examples, protection of things in Section 659 is not subordinate to protection of instrumentalities of interstate commerce.

Assuming we have accurately characterized the scope of category two cases as defined in *Lopez,* the Access Act falls easily within that category. Congress rationally concluded that goods used and dispensed by reproductive health facilities are within interstate commerce. The Access Act criminalizes the obstruction of reproductive health facilities, obstruction that Congress concluded brings the services at such facilities to a halt. H.R.Rep. at 9, 1994 U.S.C.C.A.N. at 706 (noting that targeted abortion clinics have been shut down, permanently or temporarily). When facilities are closed down, the commerce naturally comes to a halt as well. Therefore, the Access Act proscribes conduct that directly interferes with the free flow of interstate goods used in reproductive health facilities. Viewing the Access Act as a category two statute that protects goods in interstate commerce further distinguishes it from the Gun–Free School Zones Act in *Lopez.* The Gun–Free School Zones Act proscribed conduct that clearly dealt with goods in interstate commerce—possession of firearms— but the statute in no way *protected* those goods. The Access Act on the other hand proscribes conduct that directly interferes with goods in interstate commerce.

The conceptual distinction between category one and two cases (regulation of the channels and instrumentalities of interstate commerce) and category three cases (substantial effects) seems to be the difference between direct and indirect regulations of commerce, a distinction abandoned after *Jones & Laughlin, supra.* But the distinction is still helpful in differentiating category two cases, which would have easily passed muster before *Jones & Laughlin,* from category three cases, which would not. The Access Act and 18 U.S.C. § 659 are direct regulations of interstate commerce in the sense that both statutes regulate conduct that directly interferes with the free flow of goods in interstate commerce: Section 659 prohibits theft of goods and the Access Act prohibits physical obstruction of goods. The Gun–Free School Zones Act does neither with respect to firearms, nor, without further findings from Congress, is it obvious how the Act protects any interstate goods.

Holding that the Access Act qualifies as a regulation of an instrumentality of interstate commerce based on a literal reading of one sentence in *Lopez* and the citation to 18 U.S.C. § 659 is unnecessary without further guidance from the Supreme Court. Because the Access Act is constitutional as a regulation that substantially affects interstate commerce, we decline to so hold. Nonetheless, this analysis reveals that the Access Act may be viewed as a direct regulation of interstate commerce and confirms once again that the Act is well within Congress's power to legislate under the Commerce Clause.

## IV.

### Conclusion

We conclude that Congress did not exceed its authority under the Commerce Clause when it enacted the Access Act. Congress made several specific findings that the Act regulates activities that substantially affect interstate commerce. The findings are plainly rational. In substituting its judgment for that of Congress, the district court went beyond its own authority as defined by the Supreme Court: "The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. Further, nothing in the Supreme Court's *Lopez* decision compels a dif-

ferent result. The decision of the district court is therefore reversed.

COFFEY, Circuit Judge, dissenting.

The majority holds that Congress did not exceed its authority under the Commerce Clause when it enacted the Freedom of Access to Clinic Entrances Act ("the Access Act"), 18 U.S.C. § 248. I disagree. The Supreme Court has recently stated that only two types of federal regulation may be justified on the grounds that a regulated activity "substantially affects interstate commerce." The first type of regulation is a federal criminal statute that includes a jurisdictional element ensuring, through a case-by-case inquiry, that the prohibited conduct substantially affects interstate commerce. The Access Act contains no such jurisdictional element linking clinic protests to interstate commerce. The second type of constitutionally acceptable regulation reaches *economic* activity that *substantially* affects interstate commerce. Title 18 U.S.C. § 248 does not regulate the business or commercial practices of abortion clinics. Rather, the Act criminalizes the purely non-economic activity (i.e., the civil disobedience) of anti-abortion protesters. Because the Access Act, as written, falls within neither of the categories delineated by the Supreme Court in its most recent analysis of congressional power under the Commerce Clause, I must conclude that it is unconstitutional. Accordingly, I respectfully dissent.

## I. Background

At the outset, I would like to make clear that the focus of this appeal is the constitutionality of the Access Act, and specifically the question of whether Congress exceeded its authority under the Commerce Clause when it enacted this legislation. A clear analysis of the constitutional issues in this appeal requires us to jettison the charged emotions surrounding the abortion debate. The morality of abortion (now referred to in the statute as a "reproductive health ser-

vice") is irrelevant to this inquiry. Similarly, notwithstanding the majority's lengthy and minutely detailed description of the unchallenged facts, this case does not concern the protest tactics adopted by some activists in the anti-abortion movement. There are people who support this particular type of protest activity, while I and many others find it distasteful or worse.

The Constitution of the United States provides: "The Congress shall have power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying and bartering, as well as transporting for these purposes." *United States v. Lopez,* — U.S. —, —, 115 S.Ct. 1624, 1643, 131 L.Ed.2d 626 (1995) (Thomas, J., concurring).

Asserting the power granted by the Commerce Clause,[1] Congress enacted the Access Act on January 25, 1994. The Act provides, in relevant part:

(a) Prohibited Activities.—Whoever—

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at the minor.

(b) Penalties.—Whoever violates this section shall—

(1) in the case of a first offense, be fined in accordance with this title, or imprisoned not more than one year, or both; ...

---

1. Although Congress also invoked section five of the Fourteenth Amendment as authority to enact the Access Act, the majority's holding is premised on the validity of the Access Act under the Commerce Clause. I have no wish to "avoid" the Fourteenth Amendment issue, as the majority suggests. Maj.Op. at 679 n. 4. Rather, I limit my dissent to the arguments raised by the majority and thus refrain from creating unnecessary dicta.

except that *for an offense involving exclusively a non-violent physical obstruction* the fine shall be not more than $10,000 and the length of imprisonment shall be not more than six months, or both, for the first offense; and the fine shall, notwithstanding [18 U.S.C.] section 3571, be not more than $25,000 and the length of imprisonment shall be not more than 18 months, or both, for a subsequent offense.

18 U.S.C. § 248 (emphasis added).

On September 29, 1994, the six defendants in this case, all residents of the State of Wisconsin, physically obstructed the entrances of the Wisconsin Women's Health Care Center in Milwaukee, Wisconsin from 7 a.m. until 11 a.m. Allegedly, there were twelve patients scheduled to receive abortions (or, as the statute refers to them, "reproductive health services") that morning. The defendants obviously created an inconvenience, but they caused neither injury nor property damage at the facility. The following day, the United States Attorney for the Eastern District of Wisconsin announced to the media that he had charged each of the six with violating section 248(a)(1) of the Access Act. The information charged that the defendants "did by nonviolent physical obstruction intentionally intimidate and interfere, and attempt to intimidate and interfere, with persons because they were obtaining reproductive health services and with persons because they were providing reproductive health services."

The Access Act is an unusual—and, I believe, an unconstitutional—criminal statute because it does not regulate economic activity and because it does not contain federal jurisdictional language that would require a prosecutor to establish a link between the regulated activity in a particular case (e.g., the Milwaukee clinic protest) and interstate commerce. Although Congress sought to justify the Act under the Commerce Clause with "findings" purportedly establishing such a nexus with interstate commerce, the drafters omitted a jurisdictional requirement. As a consequence, although the congressional findings are replete with language reciting a nexus between clinic protests and interstate commerce, the record in this case fails to reflect whether (1) any of the patients of the clinic travelled interstate to receive abortions, (2) any of the employees of the clinic travelled interstate to work at the clinic that day, (3) the doctor at the clinic travelled interstate to provide abortions at the clinic, or (4) the protesters travelled interstate to engage in civil disobedience at the clinic (presumably, being Wisconsin residents, they did not).

The defendants entered pleas of not guilty and asserted that section 248(a)(1) of the Access Act was unconstitutional. The district court dismissed the charges, finding that the portion of the Access Act that proscribes non-violent physical obstruction of reproductive health services clinics exceeds the scope of congressional authority under both the Commerce Clause and section 5 of the Fourteenth Amendment. *United States v. Wilson,* 880 F.Supp. 621 (E.D.Wis.1995).

## II. Analysis

My dissent in this case is not prompted by a desire to strike down congressional legislation. Indeed, as a matter of judicial philosophy, I am most reluctant to do so. Nevertheless, I dissent because (1) the Access Act is a constitutionally flawed federal statute (it does not regulate economic activity and its text lacks jurisdictional or "interstate commerce" language), (2) congressional findings do not support the conclusion that the Act regulates activity *substantially affecting* interstate commerce, and (3) the majority's Commerce Clause analysis is not closely moored to the principle of federalism, as I believe it must be.

### A. *The Constitutional Flaws of the Access Act*

Reviewing the decision of the district court *de novo* and applying the current test for evaluating legislation enacted under the Commerce Clause, we must ask "whether a rational basis existed for concluding that [the] regulated activity sufficiently affected interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629. However, almost every endeavor, no matter how parochial, can be said to have some effect on "commerce," as that term has been broadly defined. *See*

*A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) ("A society such as ours is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.") (Cardozo, J., concurring). The aggregation of many actions, furthermore, can have a substantial effect. *See Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942).

Nevertheless, according to the landmark [2] case of *United States v. Lopez,* decided recently by the Supreme Court, there are very definite limits on the power of Congress to legislate under the Commerce Clause. —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez,* Chief Justice Rehnquist identified three categories of activity that Congress may regulate under the Commerce Clause:

> First, Congress may regulate the use of the *channels of interstate commerce.* Second, Congress is empowered to regulate and protect the *instrumentalities of interstate commerce,* or *persons or things in interstate commerce,* even though the threat may only come from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those *activities that substantially affect interstate commerce.*

*Id.* at ——, 115 S.Ct. at 1629 (internal citations omitted, emphasis added).

The majority holds that the Access Act is constitutional because it regulates an activity *substantially affecting interstate commerce,* relying principally upon findings in the legislative record that allegedly support this conclusion. "These findings," the majority states, "demonstrate that the Access Act falls well within Congress's Commerce Clause power to regulate activities that substantially affect interstate commerce." Maj.Op. at 683. The majority opinion leaves a void by failing to provide a definition of "rational," much less a persuasive explanation of *why* or *how* it accepts the congressional findings as rational. Instead, the majority repeatedly states that these findings are rational and concludes—without convincing support in reasoned logic or case law—that they therefore demonstrate a substantial effect on interstate commerce. I will limit my dissent to this portion of the decision and see no need to address the extensive dicta in the majority opinion outlining the various possible permutations of regulations covering the "instrumentalities of interstate commerce." *See* Maj.Op. at 686–688.[3]

*Lopez* instructs that there are only two types of valid federal regulation under the "substantial effects" test: First, "a wide variety of congressional Acts regulating intrastate *economic* activity where we have concluded that the activity substantially affected interstate commerce," —— U.S. at ——, 115 S.Ct. at 1630 (emphasis added); and second, criminal statutes that include a "jurisdictional element which would ensure, through case-by-case inquiry, that the [prohibited act] in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. *See United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (interpreting federal crime of gun possession to require specific nexus to interstate commerce). The majority either ignores or refuses to accept the important and manifest distinction between a regulation of economic activity substantially affecting interstate commerce and a criminal statute that contains a nexus to interstate commerce as one of the elements of the crime.[4] This

---

2. The majority grudgingly admits that *Lopez* is a "significant," or possibly even a "landmark" case, not because of the *content* of the decision, but because of the *outcome* (overturning a statute on Commerce Clause grounds for the first time in many years). Maj.Op. at 685. I believe that this reading of *Lopez* minimizes the legal significance of the decision and gives short shrift to the Supreme Court's careful analysis (discussed below) of the extent to which federalism limits the exercise of congressional power under the Commerce Clause.

3. This dicta, putting a questionable spin on *Lopez,* certainly does nothing to contribute to the development of the law.

4. The distinction between criminal statutes with a jurisdictional nexus and regulation of "economic activity" is not "plucked" (Maj.Op. at 684–685) out of context from *Lopez;* the distinction sets the analytic framework of *Lopez,* organizing the Court's Commerce Clause jurisprudence, explaining the modern expansion of the

glaring error serves to corrupt the majority's analysis. We must recognize and apply the restrictions on the commerce power enunciated in *Lopez* and commanded by the core principle of federalism.

The majority fails to address the well-reasoned decision of the district court squarely, but rather characterizes the district court opinion as follows:

> The district court's application of its understanding of the rational basis test—that a finding must be rejected 'if the logic underlying the stated connection to interstate commerce would provide a basis for regulating any human activity'—is seriously flawed. It is easy enough to analyze a finding, as the district court did, at the highest level of generality to find it applicable in virtually every situation. But the rational basis test, properly applied, is very different: it requires courts to defer to Congress on a case-by-case basis when Congress's findings reveal a *substantial* relation to interstate commerce.

Maj.Op. at 682 n. 7 (citation omitted).

I fail to understand the majority's assertion that the district court's reasoning is "seriously flawed." The United States Supreme Court, interpreting congressional legislation, recently reaffirmed that "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, —— U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2 (*quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 311, 101 S.Ct. 2389, 2391, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring in judgment)). While courts should not make a habit of second-guessing the democratically-elected legislature on matters of policy, the judiciary has an obligation to act when its members are convinced, as I am in this case, that constitutional boundaries have been transgressed. As Chief Justice Marshall observed in *Marbury v. Madison*, the Constitution is superior to all three branches of government:

> The powers of the legislature are defined and limited; and that those limits may not

commerce power, and elucidating the check on

be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?

5 U.S. (1 Cranch) 137, 176–77, 2 L.Ed. 60 (1803).

A fundamental problem with the majority's analysis is that it confuses and misrepresents the regulatory thrust of the statute by stating that "the Access Act, unlike the Gun Free School Zones Act, regulates a commercial activity—the provision of reproductive health services." Maj.Op. at 683. However, by its express terms, the Access Act limits the parameters of the statute to *non-economic* activity, namely the use of "force, threats of force, and physical obstruction." Moreover, the regulation applies to the *activity of the demonstrators*, not to the *activity of the clinic itself.* A federal statute that thus regulates purely non-commercial activity, while at the same time absent jurisdictional language, is unprecedented. Even Title II of the Civil Rights Act of 1964, upheld by the Supreme Court in cases widely regarded as the "high water mark" of broad Commerce Clause interpretation, is limited to the regulation of discriminatory *business* practices by hotels, motels, and restaurants. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Moreover, section 201(a) of Title II of the Civil Rights Act provides, in mandatory jurisdictional language, that a business establishment only falls within the provisions of the law "if its operations affect commerce." 42 U.S.C. § 2000a. Recently, the Court in *Lopez* made clear that *Heart of Atlanta* and *Katzenbach* both involved legislation which, *unlike* either the Access Act or the Gun Free School Zones Act, regulates "*economic* activity substantially affecting interstate commerce." —— U.S. at ——, 115 S.Ct. at 1630 (emphasis added). Based on the facts set forth in the record, I am at a loss to comprehend how the protesters, who were taking part in a *local act of civil disobedience*, can be classified as *having*

that expansion: the concept of federalism.

*engaged in commercial activity.* An example of similar activity would be schoolchildren protesting on school grounds over the dismissal of a popular teacher, or citizens protesting at the entrance of a house of ill-repute, morally outraged at the conduct within. The Milwaukee clinic protesters, like the hypothetical protesters referred to in the previous sentence, had no economic end in view: for even if the abortion procedure were free, their goal would remain unchanged.[5] As the district court correctly noted, the Access Act "does not regulate commercial entities, but rather regulates private conduct affecting commercial entities which in turn receive goods that have traveled in interstate commerce." 880 F.Supp. at 628. The Act thus regulates conduct "one step removed from the commercial enterprise." *Id.*

Following *Cheffer v. Reno,* 55 F.3d 1517 (11th Cir.1995),[6] the majority asserts that "[t]here is no authority for the proposition that Congress's power [under the Commerce Clause] extends only to the regulation of commercial entities." Maj.Op. at 684. Further, the majority cites cases that allegedly demonstrate federal regulation of criminal activity that is not commercial in nature. However, the analysis is flawed. *Lopez* delineated only two types of regulations that may be classified as regulations substantially affecting interstate commerce, despite the majority's assertion to the contrary (see Maj. Op. at 684–685). To repeat, these types of regulations are: (1) regulation of *economic activity* that *substantially affects* interstate commerce, and (2) criminal statutes with a *jurisdictional element* that *ensures a nexus to interstate commerce. Lopez,* ——— U.S. at ———————, 115 S.Ct. at 1630–31. Each of the cases cited in *Lopez* as supporting the first type of regulation (activity *substantially* affecting interstate commerce) is limited to the regulation of a class of entities or individuals engaged in some *form of economic activity,* as contrasted with the *purely non-economic activity* of the abortion protesters. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (regulation of intrastate coal-mining); *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (intrastate extortionate credit transactions); *Katzenbach,* 379 U.S. 294, 85 S.Ct. 377 (restaurants utilizing substantial interstate supplies); *Heart of Atlanta Motel,* 379 U.S. 241, 85 S.Ct. 348 (inns and hotels catering to interstate guests); *Wickard,* 317 U.S. 111, 63 S.Ct. 82 (production and consumption of home-grown wheat). *Lopez,* ——— U.S. at ———, 115 S.Ct. at 1630. In contrast, the cases cited by the majority and by the Eleventh Circuit in *Cheffer* are directed at criminal statutes that contain a jurisdictional element to ensure through a case-by-case inquiry that the activity in question affects interstate commerce. *Cheffer,* 55 F.3d at 1520 n. 6 (*citing Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (upholding 18 U.S.C. § 844(i), which penalizes "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in … any activity *affecting interstate or foreign commerce.*" (emphasis added)); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252

---

5. The Access Act has not been challenged on First Amendment grounds in this appeal. Nevertheless, in light of the cherished right to express one's views on public matters, I find it troubling that the proponents of the legislation specifically targeted the expressive conduct of those who, like the defendants in this case, "act[ed] out of an abortion-related motive." S.Rep. 103–117, 103rd Cong., 1st Sess. (1993).

6. The majority states that "[e]very other federal court to address the issue has upheld the constitutionality of the Act, including two circuit courts," Maj.Op. at 677 (citing cases), giving the impression that the great weight of authority favors its argument. I wish to make clear that

only one case from another court of appeals and two lower court cases to this date have considered the constitutionality of the Access Act in light of the Supreme Court's recent holding in *United States v. Lopez. See Cheffer,* 55 F.3d at 1517; *United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995) (finding the Access Act to be constitutional in a civil injunction proceeding); *United States v. Lucero,* 895 F.Supp. 1421 (D.Kan.1995) (finding the Access Act constitutional, but explicitly following the reasoning of *American Life League v. Reno,* 47 F.3d 642 (4th Cir.1995), *cert. denied,* ——— U.S. ———, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995), which was decided without the benefit of *Lopez* ).

(1960) (upholding the Hobbs Act, 18 U.S.C. § 1951, which penalizes "[w]hoever in any way or degree obstructs, delays, or affects *commerce* or the movement of any article or commodity *in commerce*, by robbery or extortion ... or [by] commit[ting] or threaten[ing] physical violence to any person or property.") (emphasis added)). The Access Act contains *no jurisdictional nexus to interstate commerce* similar to that found in the statutes addressed in *Russell* and *Stirone.* The majority and *Cheffer* inexplicably co-mingle regulations of economic activity and criminal statutes containing a jurisdictional element. By relying on criminal statutes containing a jurisdictional element in order to uphold § 248(a)(1) of the Access Act (which contains no such element), the majority and *Cheffer,* in effect, hold that the Commerce Clause is a "blank check" conferring upon Congress a general police power that the Framers never intended the legislative branch to exercise. This view of congressional power does not square with *Lopez* 's clear statement that the Constitution "withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1633.

Where Congress is not regulating economic activity, insisting on jurisdictional language in a federal criminal statute is essential because, "under our federal system, the '*States possess primary authority for defining and enforcing the criminal law.*'" *Id.* at ——, 115 S.Ct. at 1631 n. 3. (*quoting Brecht v. Abrahamson,* 507 U.S. 619, ——, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993) (emphasis added).[7] Jurisdictional language prevents federal authorities from usurping the power of state and local governments to make and enforce the criminal law, as they have in this case. "When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" *Id.* (*quoting United States v. En-*

*mons,* 410 U.S. 396, 411–12, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973). A jurisdictional element is therefore not mere surplusage, for it "*ensure[s], through a case by case inquiry, that the [prohibited act] in question affects interstate commerce.*" —— U.S. at ——, 115 S.Ct. at 1631. *See United States v. Bishop,* 66 F.3d 569 (3rd Cir.1995) (upholding federal car-jacking statute because, unlike the firearm possession statute struck down in *Lopez,* 18 U.S.C. § 2119 contained a jurisdictional element that required the government to prove that the vehicle stolen was "transported, shipped, or received" in interstate commerce); *United States v. Pappadopoulos,* 64 F.3d 522 (9th Cir.1995) (following *Lopez* and holding that jurisdictional element of federal arson statute had not been satisfied by proof that a private residence received natural gas from out-of-state); *United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995) (statute outlawing felon's possession of a firearm, 18 U.S.C. § 922(g)(1), survives challenge under *Lopez* because "[i]t contains an explicit requirement that a nexus to interstate commerce be established.").

A statute without jurisdictional language permits a careless or overzealous federal prosecutor to bring the full weight of the national government to bear on a situation that may, in fact, lack any true connection with interstate commerce. By contrast, a properly framed statute that contains jurisdictional language requires the government's prosecutor to establish that the statute, *as applied,* is consistent with the federal government's authority under the Commerce Clause, and forces the prosecutor to *establish a connection to interstate commerce beyond a reasonable doubt.* Compare 18 U.S.C. § 2113(f) (federal bank robbery statute limited to those banks that are members of the Federal Reserve System or insured by the Federal Deposit Insurance Corporation).

The majority and the Eleventh Circuit in *Cheffer* misleadingly cite federal criminal statutes with a nexus to interstate commerce

---

7. I wish to make clear that a jurisdictional element is not required in every federal criminal statute; it is not required where the statute regulates "economic activity." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. *See, e.g., Perez,* 402 U.S. at 146, 91 S.Ct. at 1357 (regulation of extortion-

ate credit transactions). The law, made clear in *Lopez,* is that where Congress is not regulating economic activity, or instrumentalities in interstate commerce, the concept of federalism requires a jurisdictional element linking the criminal act to interstate commerce.

in an attempt to justify federal prohibition of a non-economic intrastate activity that is not part of a national economic regulatory scheme: civil disobedience at abortion clinics. What the majority and the Eleventh Circuit ignore is that the federal criminal statutes they cite *do in fact contain specific jurisdictional language requiring that the federal prosecutor clearly establish a connection between the allegedly unlawful acts and interstate commerce.* It bears repeating that there is *no such element* in the Access Act. By relying on criminal statutes containing a jurisdictional element in order to uphold the Access Act, the majority and *Cheffer* have failed to comprehend and have effectively obliterated the constitutional limitations inherent in the Commerce Clause.

Finally, I find it noteworthy that the complete absence of any jurisdictional requirement in the Access Act stands in marked contrast to the congressional findings purportedly establishing that the legislation is a valid exercise of the commerce power (the adequacy of these findings will be discussed below). The omission of such language does more than merely suggest sloppy draftsmanship; it *reflects an implicit recognition that the statute in fact regulates activity that is beyond the reach of the Congress under the Commerce Clause.* In other words, the findings of the 103rd Congress "ring hollow." That Congress attempted to establish, in the legislative record, that the Act regulates activity substantially affecting interstate commerce, yet the drafters rendered these findings meaningless by failing to include a jurisdictional requirement in the Act itself. Why? One possible conclusion is that the drafters omitted such a requirement because they feared cases like the one before us (which, as far as the record reveals, has no significant connection with interstate commerce) and preferred instead to rely vaguely on "the affirmative power of Congress to enact this legislation under section 8 of article I of the Constitution." P.L. 103–259, 103rd Cong. 2nd Sess. Sec. 2 ("Purpose").

### B. *Congressional Findings*

Congressional findings aid us in reviewing the legislative judgment that underlies a particular piece of legislation. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632. The majority holds, without providing any persuasive reasoning or authority, that the findings made in support of the Access Act demonstrate the validity of the 103rd Congress's determination that the Act regulates conduct (clinic protest) substantially affecting interstate commerce. I do not agree.

The Supreme Court in *Lopez* noted that congressional findings, although not required, are useful because they "enable [a reviewing court] to evaluate the legislative judgment that the act in question substantially affected interstate commerce," especially when a substantial effect is not self-evident ("visible to the naked eye"). *Id.* Congress did make findings in connection with the Access Act, as it did not when it enacted the statute challenged in *Lopez.* However, I make two observations with respect to these findings. First, even detailed findings cannot make up for the constitutional flaws of the Act, namely, the fact that it neither regulates an economic activity nor contains jurisdictional language. A related point, noted above, is that these findings "ring hollow" in light of the complete absence of jurisdictional language in the Act itself. Congress found a need for federal criminal legislation based on an alleged nexus between clinic protest activity and interstate commerce, yet it failed to require a case-by-case showing that federal jurisdiction is appropriate. Second, the findings relied upon to justify the Access Act provide little support for the conclusion that the Act regulates activity *substantially affecting* commerce.

Congress's first finding was that abortion clinics operate in the stream of commerce because they "purchase medicine, medical products, surgical instruments and other necessary medical products, often from other States; they employ staff; they own or lease office space." S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 31 (1993).

Second, Congress found that certain individuals travel between states not only to obtain but also to provide abortion services. "Attorney General Reno pointed out that a

Federal District court in Wichita, KS, found that 44 percent of the patients at the clinic there came from out-of-State. And Willa Craig testified before the Committee that many patients of her clinic in Montana came from Idaho, Washington, Wyoming and Canada. Clinic employees sometimes travel across State lines to work as well. Like Dr. David Gunn, the physician who was killed in Pensacola, FL, some doctors who perform abortions work in facilities in more than one State." *Id.* Other than the anecdotal evidence Congress selectively chose to rely upon and include in the legislative record, there is little to support the conclusion that abortion services always or even frequently necessitate interstate travel. We have no way of knowing whether the experiences, backgrounds, or localities cited by Congress are representative of a substantial number of clinics providing "reproductive health services," as the findings suggest. In fact, we could easily conclude that they are not, given the rural and sparsely-populated character of the areas from which these examples are drawn. Montana and the surrounding states, for instance, *likely* have far fewer abortion clinics than Wisconsin or Illinois.[8]

Third, Congress found that *violence* at abortion clinics "results in the provision of fewer abortions and less interstate movement of people and goods." *Id.* In support of this, there was evidence that arson and other *violent* acts had shut down several clinics and resulted in the reduction of availability of abortion services for some women. H.R. 103–306, 103rd Cong., at 8–9 (1994) reprinted in 1994 U.S.C.C.A.N. 699, 706.

Fourth, Congress "found" that obstruction of facilities is beyond the control of local law enforcement, asserting that "local law enforcement authorities are *frequently* overwhelmed by the sheer numbers of the blockaders." S.Rep. No. 103–117 at 20 (emphasis added). "On one occasion in *Falls Church, Virginia,* for example, the city's entire police force of *thirty uniformed officers* faced blockades involving as many as *240 persons,* and the city could not effectively combat the blockaders' military-style tactics." Although

the city of Falls Church, Virginia, may, on this particular occasion, have encountered difficulty handling 240 protesters, the same is not true for *Milwaukee County,* whose *2,662 law enforcement personnel* (2,086 city police and 576 officers of the Sheriff's Department, with concurrent jurisdiction in the city of Milwaukee) certainly did not require federal intervention to deal with and control *six* nonviolent protesters. Moreover, the majority concedes that the fourth congressional finding does not justify Congress's power to enact the Access Act.

The majority, without any persuasive logic or reasoning, much less case law, upholds the Access Act because it believes that the first three findings are "plainly rational ... and reveal the regulated activities' substantial relation to interstate commerce." Maj. Op. at 680. Initially, it should be noted that the first three congressional conclusions focus exclusively on the activity of particular *clinics.* However, as discussed above, the Access Act criminalizes the conduct of the *protesters.* Although the findings may thus indicate that clinics, their employees, and their clients are involved in the stream of interstate commerce, it is protesters who are the primary targets of the federal legislation.

With respect to the first three congressional findings, the majority may be correct that they are "rational," in the broadest possible sense of that term. There may very well be abortion clinics operating in the stream of interstate commerce and certain individuals may indeed travel between states to receive or provide abortion services, particularly where an abortion clinic is strategically located near a state line and/or in the case of a state that has no clinics within its borders. However, as the district court pointed out, this is nothing but a rational description of a generalized class of activities, and is far removed from a justification for the exercise of the commerce power. Like the district court, I am hard-pressed to posit any activity that would not be covered by such an all-inclusive description. I am sure marriage counselors sometimes receive clients from other states. I am confident

---

**8.** The legislative record contains no facts that would be relevant on this issue, such as how

many states have abortion clinics, or how many hospitals provide abortions.

that certain golf courses attract players from other states. Some adoption agencies service customers from other states. Pet stores acquire animals from other states. Churches have parishioners and purchase liturgical supplies from other states. If any activity can be described in such a fashion, then any act that tends to affect the level of that activity may be regulated according to the all-encompassing logic asserted by the majority to support the Access Act. For instance, Congress could enact a law that prohibits obstruction or picketing outside *any* house of ill-repute simply because commercial transactions occur within, or because *some* supplies and customers *may* have travelled interstate. Similarly, it could ban protest activity of any kind near a school on the theory that the *school* is an actor in interstate commerce, i.e., because the school receives textbooks, computers, supplies (and possibly teachers) *via* the stream of interstate commerce. For that matter, Congress could make a federal crime out of demonstrating outside a private home on the grounds that numerous household items within (or perhaps the materials used to construct the building) have traveled in interstate commerce. The district court did not exaggerate in the least when it observed that under this rationale, "no one is immune from federal regulation [or prosecution] under the Commerce power." 880 F.Supp. at 630. The breadth of this interpretation of the Commerce Clause essentially transforms a grant of power over interstate *commerce* into something that the Framers never intended: a general police power to be exercised by the central government at the expense of state and local sovereignty. If accepted (and I hasten to add, it was not accepted in *Lopez*) this sweeping rationale would amount to more than a "new brand of federalism for the 1990's," it would represent the *end* of federalism in any meaningful sense of that term. Moreover, it would give Congress *carte blanche* authority to engage in social engineering of the kind that has been so prevalent during the past thirty years.

The majority also holds that the findings show that non-violent obstruction exerts a substantial effect on interstate commerce. As a threshold matter, I point out that Congress stated, in support of the Access Act, that "once Congress finds that a class of activities *affects* interstate commerce, Congress may regulate all activities within that class." S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 31 (1993). This broad assertion is completely at odds with the original understanding of the Framers with respect to the Commerce Clause. It is also plainly incorrect, in light of *Lopez*'s requirement that Congress may only regulate "those activities that *substantially affect* interstate commerce." —— U.S. at ——, 115 S.Ct. at 1629 (emphasis added).

Secondly, I condemn the violence employed by some extremists in the anti-abortion movement, but note that the question of violent conduct is not before us. Indeed, nowhere in the congressional findings do we find a reference to, much less a meaningful discussion of, *the impact of non-violent obstruction on interstate commerce.* The majority, in dicta, obscures the evaluation of the actual acts before the court by discussing congressional statistics stating that over a sixteen-year period, more than 1,000 acts of violence were directed against abortion clinics and providers, including "at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic 'invasions,' and one murder." Maj.Op. at 678. These statistics have no bearing on the case at hand because the defendants were not engaged in and thus could not be charged with violent crime, but merely with local, "non-violent physical obstruction." Furthermore, as defense counsel pointed out at oral argument, the majority's statistics can most gently be described as misleading. When analyzed with care, as I believe they must be, these numbers reveal that over the measured period of sixteen years, there were 62.5 acts of violence directed at abortion clinics or providers nationally per year, or 1.25 acts of violence per state annually. I do not understand how slightly more than one act of violence per state each year provides a rational basis for concluding that interstate commerce is *"substantially* affected," especially since the conduct outlawed and prosecuted in this case was non-violent.

Thirdly, although the congressional record reveals that some patients were delayed and inexcusably harassed and intimidated, there is no evidence that the actual number of abortions performed was *substantially* reduced as a result of *non-violent* protest.

I realize that this analysis of the congressional record may be criticized as "strict scrutiny," and not the rational basis inquiry which is proper under the Commerce Clause. However, because the acts prohibited by 18 U.S.C. § 248 (acts of civil disobedience) are in no meaningful sense motivated by or directed at interstate commerce (as the services of abortion providers sometimes are), I believe that the findings, relied upon by our supreme legislative body and by the majority, should be evaluated carefully and not accepted at face value.

### C. *Disruption of the Federal/State Balance*

As Justice Powell observed a decade ago, "federal overreaching under the Commerce Clause undermines the constitutionally mandated balance of power between the States and the Federal Government, a balance designed to protect our fundamental liberties." *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 572, 105 S.Ct. 1005, 1028, 83 L.Ed.2d 1016 (1985) (Powell, J., dissenting).

In *Lopez,* five justices recently agreed that the constitutional principle of federalism limits the extent to which the Commerce Clause may logically be interpreted as a grant of "plenary" power. As Justice Thomas notes in his concurring opinion:

> [I]t seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to individual States, notwithstanding these activities' effect on interstate commerce.

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1642 (Thomas, J., concurring).

Federalism is the lens through which the commerce power must be viewed. In other words, the power of Congress under Article I, section eight must be read in conjunction with the Tenth Amendment of the Constitution, which provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are *reserved to the States respectively, or to the people.*" U.S. Const., amend. X (emphasis added). As James Madison explained, the Framers envisioned a federal system in which the powers of the central government would be limited:

> The powers delegated by the proposed constitution to the federal government, are few and defined. Those which are to remain in the state governments are numerous and indefinite. The former will be exercised principally on external objects, [such] as war, peace, negotiation, and foreign commerce.... The powers *reserved to the several states will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the state.*

Federalist No. 45 (James Madison, 1788) (emphasis added).

Even in modern times, the Supreme Court has warned that:

> [t]he scope of [the commerce] power must be considered in the light of our dual system of government and *may not be extended so as to* embrace effects on interstate commerce so indirect and remote that to embrace them, in view of our complex society, would *effectually obliterate the distinction between what is national and what is local and create a completely centralized government.*

*NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937) (emphasis added).

The federal overkill in this case was twofold: First, Congress passed a statute that exceeded its authority under the Commerce Clause, and second, the federal authorities aggressively applied that statute, disregarding the ability of state and local officials to deal with the disruption caused by the Milwaukee clinic protesters. This double overkill illustrates the vast distance modern con-

stitutional interpretation has travelled from the Framers' understanding of the commerce power, and underscores the dangers of an open-ended interpretation of the Commerce Clause. The effect of the Access Act is to transform what would ordinarily be a second misdemeanor offense under state or local law into a *federal* felony, without a required showing that the local crime be connected to interstate commerce. Although the length of imprisonment for a first violation of the Access Act is six months, the penalty increases to eighteen months of imprisonment (a felony) for a subsequent offense. 18 U.S.C. § 248(b)(1). Sincerely motivated protesters, who are likely to protest on more than one occasion, will thus become felons when charged by federal authorities with a second trespass or disorderly conduct violation. *See* United States Sentencing Guidelines, § 4A1.2(*o*) (1994) (defining "felony offense" as an offense punishable by death or a term of imprisonment of greater than one year); 18 U.S.C. § 3156(a)(3) ("the term 'felony' means an offense punishable by a maximum term of imprisonment of more than one year.").[9]

In my opinion, congressional overreaching of this nature threatens the very delicate balance between federal and state authority and creates a legal and political climate in which the federal government is likely to make further intrusions into the constitutional territory of state and local governments. The rationale asserted by Congress and approved by the majority on behalf of the Access Act would permit federal regulation of almost every type of imaginable activity or endeavor, without requiring any demonstration that federal involvement is appropriate or necessary. While we tend to think of many crimes as "national concerns," our traditional practice has been to leave the definition and regulation of the vast majority of these societal ills to the political process at the state level.

From trespass to theft, almost each and every criminal violation, taken in the aggregate, can be said to have a negative influence on some aspect of commerce. Obviously, it does not follow that the Commerce Clause can be used to extend congressional authority over *all* criminal activity, including, as in this case, conduct which qualifies as trespass or disorderly conduct. Such an expansive reading of the Commerce Clause intrudes on those areas which have been traditionally and more properly left to regulation by the states. This can only have profound consequences for the division between national and local authority within our political structure. As Justice Kennedy (joined by Justice O'Connor) astutely reminds us, there is a link between federalism and political accountability:

> Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory.

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1638 (Kennedy, J., concurring).

The majority further overlooks the fact that *all* the states have trespass laws and several have even enacted regulations specifically tailored to the conduct broadly proscribed by the Access Act. *See e.g. State v. Migliorino,* 150 Wis.2d 513, 442 N.W.2d 36 (1989), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989) (upholding convictions of anti-abortion protesters under Wisconsin statute prohibiting trespass in a medical facility); *Hill v. City of Lakewood,* 911 P.2d 670 (Colo.App.1995) (upholding Colorado statute against First Amendment challenge where statute limited obstruction and certain conduct within 100 feet of health care facility entrances), *but see Edwards v. City of Santa Barbara,* 883 F.Supp. 1379 (C.D.Cal. 1995) (granting First Amendment challenge to Santa Barbara city ordinance that limited protest activity outside medical clinics and places of worship). In fact, the defendants in this case had already been removed from the

---

9. A felony conviction not only dramatically increases liability for punishment under the federal sentencing guidelines, but it also results in serious limitations on an individual's rights because many states bar felons from eligibility for professional licensing or holding public office, gun ownership, and voting, to name a few examples.

scene by Milwaukee Fire Department personnel, arrested by officers of the Milwaukee Police Department, and transported to the Milwaukee County Jail, where they were in custody and awaiting prosecution in the state system for disorderly conduct when the federal government stepped in and took over.[10] There is no evidence that the judiciary and law enforcement apparatus of the city or county of Milwaukee, acting under Wisconsin state law, were so inadequate that they could not handle a disorderly conduct charge. In fact, the law enforcement and justice system of Milwaukee County, like those of other urban areas across the United States, are equipped to grapple with, and indeed have frequently and successfully managed and controlled, far more serious conduct than that prohibited by the Access Act, including violent crime.[11] Further, the law is clear that in the event that local law enforcement officials are in need of additional back-up support to enforce their laws, federal assistance is available under 42 U.S.C. § 10501. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 288, 113 S.Ct. 753, 769, 122 L.Ed.2d 34 (1993) ("In the event of a law enforcement emergency as to which 'State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law,' [under] Sec. 10502(3), the Attorney General is empowered to put the full range of federal law enforcement resources at the disposal of the State."). There is nothing in the record to suggest that local officials requested or were in need of such assistance.

I am well aware that the dual sovereignty of the state and federal governments often results in overlapping criminal jurisdiction; I am also aware, however, that respect for the concept of federalism, as well as prudent fiscal policy, requires that enforcement of the local criminal law be left to state and local authorities whenever and wherever possible.[12] *Cf. American Dental Ass'n v. Martin,* 984 F.2d 823, 848 (7th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 172, 126 L.Ed.2d 132 (1993) (Coffey, J., concurring in part, dissenting in part) (observing that costly federal OSHA regulations duplicated regulations promulgated by state health agencies and medical professional associations, while doing little to improve workplace safety). At a time when the resources of federal law enforcement and of the federal courts are stretched to the limit combating problems that truly require a concerted national response (e.g., the drug trade), it is difficult to understand why the federal authorities in the city of Milwaukee saw fit to "make a federal case" out of the non-violent, local Milwaukee protest incident. In light of the fact that

10. Under Wisconsin law, disorderly conduct is classified as a Class B misdemeanor, punishable by "a fine not to exceed $1,000 or imprisonment not to exceed 90 days, or both." *See* Wis.Stat. Ann. §§ 947.01, 943.145 and 939.51 (West 1995). Under Wisconsin's habitual offender statute, one who is convicted of a misdemeanor that carries a maximum term of imprisonment of one year or less may have his penalty increased to not more than three years imprisonment if he is a "repeater," (i.e., if he has been convicted of a misdemeanor on three separate occasions within the preceding five-year period). Wis.Stat.Ann. § 939.62 (West 1995). An enhanced penalty for a misdemeanor does not convert the offense into a felony. *Harms v. State,* 36 Wis.2d 282, 153 N.W.2d 78 (1967). Thus, under Wisconsin law, the penalty for a second or even a third conviction for disorderly conduct does not carry the severe penalties provided by the Access Act for a second or subsequent conviction for non-violent physical obstruction (maximum of 18 months imprisonment and/or a fine of up to $25,000; *see* 18 U.S.C. § 248(b)).

11. In Milwaukee County in 1992 there were 151 total homicides, 15 of which were gang related; in 1993 there were 164 total homicides, 9 of which were gang related; and in 1994 there were 143 total homicides, 12 of which were gang related. All of the gang-related homicides occurred in the city of Milwaukee. State of Wisconsin, Office of Justice Assistance, November 27, 1995.

12. The proponents of the Access Act evidently believed that a certain (undetermined) number of state and local authorities felt unable to deal with the perceived problem of anti-abortion protest activity under state and local law. *See* S.Rep. No. 103–117, 103rd Cong., 1st Sess. § IV(e) (1993). Nevertheless, the statute itself recognizes that this will not always be the case. One of the statute's "rules of construction" is that nothing in the statute "shall be construed ... to provide exclusive criminal penalties ... with respect to the conduct prohibited by this section, *or to preempt State or local laws that may provide such penalties.*" 18 U.S.C. § 248(d) (emphasis added).

local authorities had the situation well in hand, the United States Attorney's decision to prosecute the Milwaukee protesters is yet another example of unnecessary litigation that weakens the federal justice system by hampering the ability of the already overburdened federal courts to process meritorious civil claims.

As the foregoing discussion makes clear, there are sound practical as well as theoretical reasons for resisting the "federalization" of our criminal law. The current Chairman of the Senate Judiciary Committee recently noted that it is important to "balance the interests of the states and the national government in fighting crime," in part, to avoid overburdening the federal courts. *The Third Branch: Newsletter of the Federal Courts*, Vol. 27, No. 11 (November 1995). As a matter of constitutional law and good public policy, states should retain responsibility for combating most crime while "the national government's primary role should be limited to those crimes that have a *truly international or interstate character*." *Id.* (providing examples of drug interdiction, crimes such as "stalking" which transcend state boundaries, and criminal activity directed at federally-backed institutions such as banks) (emphasis added).

## III. Conclusion

The Commerce Clause, as it is generally interpreted nowadays, is indeed much broader than intended by the Framers, and—like many provisions of the Constitution—is often interpreted without reference to the original understanding of the Framers as revealed by the text and history of the founding document. I am afraid that, in all probability, "too much water has passed over the dam for there to be a candid judicial reexamination of the commerce clause that looks only to first principles." Richard A. Epstein, *The Proper Scope of the Commerce Power*, 73 Va.L.Rev. 1387 (1987). *But see Lopez*, —— U.S. at ——–——, 115 S.Ct. at 1642–43 ("In an appropriate case, I believe that we must further reconsider the 'substantial effects' test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting our

more recent Commerce Clause jurisprudence.") (Thomas, J., concurring). The Supreme Court has held that Congress may utilize the commerce power for non-commercial reasons (e.g., to advance a national civil rights agenda. *See Heart of Atlanta*, 379 U.S. at 252–53, 85 S.Ct. at 354–55) and that it may regulate intra-state activity under the Commerce Clause. *See Wickard*, 317 U.S. at 128, 63 S.Ct. at 90–91 (explaining the potential to undercut a national regulatory scheme governing wheat production by the aggregate effect of intrastate farming activity). However, the Court has never gone so far as to hold that Congress may criminalize *non-commercial* activity, absent a nexus between that activity and commerce. The teaching of *Lopez* is that even the capacious understanding of the commerce power articulated during this century must have limits. As Justice Kennedy explained with regard to gun possession in *Lopez*: "unlike the earlier cases to come before the court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus." *Lopez*, —— U.S. at ——–, 115 S.Ct. at 1640 (Kennedy, J., concurring). These limits on the commerce power are compelled by case law, common sense, logic, reason and—above all—a due respect for the core constitutional principle of federalism. I believe that if we were to uphold section 248(a)(1) of the Access Act, congressional power would be extended in a manner that the Supreme Court has just recently reviewed and forcefully warned against.

The Framers of the Constitution could have given Congress the power to enact laws for the general welfare, thus granting the national legislature a general "police power" to deal with all of the conceivable social ills of American society. They did not. Instead, after much deliberation and discussion, they crafted a document that endures to this day because it wisely limits the power of the national government and its three component branches. Congressional power admittedly includes broad authority to regulate interstate commerce. However, as *Lopez* makes clear, that authority is *not unlimited*. Because the Access Act neither regulates an *economic* activity *substantially affecting* in-

terstate commerce nor contains a *jurisdictional element* linking the proscribed action to interstate commerce, I must conclude that the Act in its present form is unconstitutional. I therefore respectfully dissent.